# Illinois Official Reports

## Appellate Court

---

***People v. Jackson*, 2018 IL App (1st) 150487**

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. RONALD JACKSON, Defendant-Appellant. |
| District & No. | First District, Sixth Division<br>Docket No. 1-15-0487 |
| Filed<br>Rehearing denied | May 18, 2018<br>June 11, 2018 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 11-CR-12720(1); the Hon. Dennis J. Porter, Judge, presiding. |
| Judgment | Affirmed; mittimus corrected. |
| Counsel on Appeal | Michael J. Pelletier, Patricia Mysza, and Caroline Bourland, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Joseph Alexander, and Michelle Corda, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE DELORT delivered the judgment of the court, with opinion.<br>Presiding Justice Hoffman and Justice Connors concurred in the judgment and opinion. |

**OPINION**

¶ 1    The State charged defendant, Ronald Jackson, and a codefendant, Marvin Fields, with, among other things, one count of attempted murder of a peace officer. Defendant and Fields were tried jointly before separate juries. Fields's jury acquitted him of the main offense but convicted him on the lesser included offense of attempted murder.[1] Defendant's jury saw things differently and convicted him of the more serious crime of attempted murder of a peace officer. Defendant contends that this difference in outcomes was the result of ineffective assistance of counsel and of other errors which permeated his trial. We affirm and correct the mittimus.

¶ 2                                    BACKGROUND

¶ 3    Because defendant was tried jointly with Fields and each defendant had his own jury, some testimony which we discuss below was presented to defendant's jury but not Fields's, and vice versa. Unless otherwise specified, however, all the testimony and evidence we describe was presented to both juries.

¶ 4    At trial, Officer Victor Portis testified that on the evening of January 12, 2011, he and his partner, Officer Andrew Dennis, were patrolling a four-block area in the Roseland neighborhood of Chicago as part of a "violence suppression mission." They patrolled in an unmarked police vehicle. Because their mission required that they be inconspicuous, Officer Portis was wearing "civilian dress," with his badge displayed on a chain hanging from his neck.

¶ 5    During the patrol, Officer Portis saw two people in an alley between State Street and Lafayette Avenue. When he approached to conduct a field interview, one of the individuals fled west towards Lafayette Avenue, while the other person remained behind. Officer Portis gave chase. At the intersection of 120th Street and State Street, he saw two different people, whom he identified at trial as defendant and Fields, running east on 120th Street onto State Street. Fields was wearing a black jacket with a fur collar, and defendant was wearing a black jacket. When they were half a block apart, Officer Portis yelled "stop," "get back," and announced his office. Fields then stopped, raised a gun, and fired at him. Jackson was one to two feet behind Fields.

¶ 6    Officer Portis returned fire and dove behind a vehicle, injuring his wrist in the process. As bullets continued to rain down on his position, Officer Portis radioed for assistance. Shortly thereafter, Officer Dennis arrived in his police vehicle, and the suspects fled. A few minutes later, Officer Portis was informed that Fields had been taken into custody. Officer Portis went to Fields's location and identified him as "the one that fired the initial shot."

¶ 7    On cross-examination before defendant's jury only, Officer Portis testified that he did not see two people firing at him. He reiterated that he saw Fields fire at him but stated with respect to defendant, "I saw him on scene, but no, I did not see him firing at me." Upon further direct examination before defendant's jury, Officer Portis testified that he saw multiple muzzle flashes coming from Fields and defendant's direction. Fields then cross-examined Officer

---

[1]This court affirmed Fields's conviction. See *People v. Fields*, 2016 IL App (1st) 142763-U.

Portis in front of *his* jury only. Responding to a question posed by Fields's attorney, Officer Portis testified that he was wearing a grey hooded jacket and grey pants on the date in question.

¶ 8 Officer Dennis testified that while Officer Portis pursued the person who fled, he remained behind to speak to the other person who did not flee. Within 20 to 25 seconds, however, Officer Dennis heard gunfire, so he ended the interview and drove towards 120th and State Street, where he saw multiple muzzle flashes from gunfire and Officer Portis crouching behind a car. Officer Dennis stated that the person firing the gun was wearing a black coat with a fur hood. When the shooting stopped, he drove to Officer Portis and picked him up. At trial, Officer Dennis identified defendant as the person he saw firing towards Officer Portis.

¶ 9 On cross-examination before defendant's jury only, Officer Dennis testified that he only saw one shooter, who was wearing a black coat with fur trim. He acknowledged learning at a later date that Fields, not Jackson, was wearing a black coat with fur trim. Thereafter, pressed by trial counsel, Officer Dennis conceded that "the person that [he] saw shooting was Marvin Fields, not [defendant.]" Officer Dennis then admitted, again at defense counsel's behest, that he did not see defendant with a firearm at any point.

¶ 10 On cross-examination before Fields's jury only, Officer Dennis testified that he and Officer Portis were in civilian clothes. He further testified that when he heard the gunfire, he did not hear anyone saying anything.

¶ 11 Sergeant Eric Jackson testified that he was supervising the violence suppression mission. Sergeant Jackson stated that he was near 120th Street and Lafayette Avenue when he heard Officer Portis's distress call. The sergeant was wearing civilian clothes and driving an unmarked police vehicle. After hearing the call, he exited his vehicle. He then saw a man, whom he later identified as defendant, exit from a gangway "at 119th Street on the east side of Lafayette" and begin walking "briskly" north on Lafayette Avenue. Sergeant Jackson observed defendant discard a black jacket and gloves he was wearing and then run into a gangway towards 119th Street and Perry Street and hop a fence. Defendant emerged near 11925 South Perry Street, where he was detained. Once Sergeant Jackson heard that defendant had been caught, he went back to collect the jacket and gloves that defendant had dropped. Sergeant Jackson later learned that Fields was detained a few blocks away in an abandoned house and that two firearms were discovered where he was hiding. On cross-examination before Fields's jury only, he testified that, other than what he heard on the radio, he did not hear Officer Portis say anything during the shooting.

¶ 12 Officer Chris Skarupinski testified that he was driving in an unmarked police vehicle with two other officers in support of the violence suppression mission. He explained that he and his fellow officers "were in plain clothes, which would be jeans or sweaters." Around 9 p.m., Officer Skarupinski's unit was driving near 111th Street and Wentworth Avenue and received a call of shots fired at an officer. In response, they drove to an alley near 119th Street and Lafayette Avenue and exited their vehicle. When Officer Skarupinski saw defendant running through an alley, he began running on the street in a direction parallel to defendant's path of travel. The officers eventually cornered defendant in a yard on Perry Street. At that point, Officer Skarupinski drew his service weapon and ordered defendant to the ground, while another officer attempted to detain him. Defendant did not comply and instead resisted arrest, so a third officer took defendant to the ground. Defendant continued resisting, and his compliance was not achieved until a fourth officer, Officer Timothy Davis, arrived on scene and deployed a Taser on defendant.

¶ 13    On cross-examination before defendant's jury only, Officer Skarupinski testified that he never saw defendant with a weapon at any point and that the police did not recover a weapon from defendant. He noted that defendant was actually released from custody the following morning and that he was not brought back into police custody until July 11, 2011.

¶ 14    Officer Timothy Davis testified that he was patrolling the neighborhood in a marked police vehicle. Around 9 p.m., Officer Davis heard Officer Portis's distress call and drove to 11925 South Perry Street. When he arrived, he saw other officers struggling to take defendant into custody. Officer Davis explained that defendant "wouldn't show his arm, and he wouldn't give up his other arm." Officer Davis announced that he was going to deploy his Taser, but defendant continued resisting. Officer Davis then tasered defendant and he became compliant.

¶ 15    Nancy DeCook, a forensic investigator for the Chicago Police Department, testified that she recovered 15 .40-caliber shell casings at 12010 South State Street. Less than a quarter block away, at 12025 South State Street, she recovered five .45-caliber shell casings. She then went to 12011 South Lafayette Avenue, where Fields was detained, and processed the area. There, she recovered a Sig Sauer pistol and a .40-caliber Smith and Wesson pistol.

¶ 16    Marc Pomerance, a forensic scientist with the Illinois State Police, testified as an expert in the field of firearms and firearms identification. During his testimony, Pomerance identified the firearms recovered from 12011 South Lafayette Avenue. He explained that the Sig Sauer was a .40-caliber Smith and Wesson pistol, and that the other gun was a .40-caliber semiautomatic Smith and Wesson firearm. He examined 15 of the shell casings that were recovered and found that 10 were fired from the Sig Sauer and 5 were fired from the other gun.

¶ 17    Ellen Chapman, a forensic scientist with the Illinois State Police, testified as an expert in the field of gunshot residue (GSR). Chapman explained that the samples taken from defendant's hands "contained particles that were characteristics of background samples." As a result, she concluded that defendant "may not have discharged a firearm. If he did discharge a firearm, then the particles were removed by activity, not deposited, or not detected by our procedures." She noted, however, that it was "quite possible" that if a shooter was wearing gloves, they would prevent GSR from contacting the shooter's skin. Thereafter, Chapman testified that one of defendant's gloves "contained tri-component and consistent gunshot residue particles," which led her to conclude that the glove's surface "contacted a primer gunshot residue related item or was in the environment of a discharged firearm. Similarly, Chapman testified that the right cuff area of defendant's jacket also "contained tri-component and consistent gunshot residue particles," which likewise caused her to conclude that the right cuff of the jacket "either contacted a gunshot residue item or was in the environment of a discharged firearm."

¶ 18    On cross-examination, Chapman clarified that she did not conclude that defendant discharged a firearm. She acknowledged that it was possible for a person's clothes to test positive for GSR if the person was in an area where a gun was fired or next to a person discharging a firearm.

¶ 19    After the State rested, defendant presented his case-in-chief, which consisted entirely of testimony from Chicago police detective William Sullivan. Detective Sullivan testified that he was assigned to investigate the shooting and that he interviewed Officer Portis as part of that investigation. Defense counsel asked Detective Sullivan whether Officer Portis said there were multiple shooters. In response, Detective Sullivan stated, "What he stated is that he saw only

one of two shooters, but he saw multiple muzzle flashes once he engaged the individual that was shooting at him." He then testified that Officer Portis said he only saw one shooter.

¶ 20  Before the case was submitted to the jury, the court held an instruction conference. At defendant's request, the court instructed the jury on the lesser included offenses of straight attempted murder and aggravated discharge of a firearm. After deliberations, the jury found defendant guilty of attempted murder of a peace officer.

¶ 21  Afterwards, defendant argued that his trial counsel was ineffective for, among other things, failing to call Fields to testify. Defendant contends that Fields would have told the jury that defendant was not present at the scene of the shooting. The court appointed a new lawyer from the public defender's office to serve as posttrial counsel and held a *Krankel* hearing. See *People v. Krankel*, 102 Ill. 2d 181 (1984). Trial counsel testified at the hearing, but his testimony was limited to explaining the basis for his decision not to call Fields to testify in defendant's case-in-chief. After that testimony, the court denied defendant's posttrial motion. Thereafter, the court sentenced defendant to 38 years' imprisonment, which consisted of 23 years for the base offense, plus a 15-year enhancement because defendant personally discharged a firearm during the offense.

¶ 22                                          ANALYSIS

¶ 23  We first consider defendant's argument that his trial attorney was ineffective because, when he cross-examined the police witnesses, he did not elicit testimony demonstrating that the defendant did not know that Officer Portis was a police officer. Defendant specifically argues that when trial counsel cross-examined Officers Portis and Dennis and Sergeant Jackson, he should have proceeded as Fields's attorney did, and elicited testimony (1) from Officer Portis explaining that he was dressed to blend into the community and (2) from Officer Dennis and Sergeant Jackson that they did not hear Officer Portis yelling that he was a police officer.

¶ 24  Ineffective assistance of counsel claims are governed by the familiar two-part test set forth by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984). A defendant raising a *Strickland* claim "must show that counsel's performance was deficient" and "that the deficient performance prejudiced the defense." *Id.* at 687.

¶ 25  We begin by considering whether trial counsel's performance was constitutionally deficient. " '*Strickland*'s first prong sets a high bar.' " *People v. Jones*, 2017 IL App (1st) 143766, ¶ 41 (quoting *Buck v. Davis*, 580 U.S. ___, ___, 137 S. Ct. 759, 775 (2017)). To meet that high hurdle, " 'the defendant must prove that counsel made errors so serious, and that counsel's performance was so deficient, that counsel was not functioning as the "counsel" guaranteed by the sixth amendment.' " *Id.* (quoting *People v. Evans*, 186 Ill. 2d 83, 93 (1999)). In so doing, the defendant must " 'overcome the strong presumption that the challenged action or inaction may have been the product of sound trial strategy.' " *Id.* (quoting *People v. Manning*, 241 Ill. 2d 319, 327 (2011)).

¶ 26  During the *Krankel* hearing, defendant could have asked trial counsel to explain why he conducted his cross-examinations in the manner he did. He did not. The record therefore does not reveal why trial counsel did not question the police witnesses about what they heard and what they were wearing. Nonetheless, *People v. Veach*, 2017 IL 120649, makes clear that the barren nature of the record does not render this argument procedurally improper. But it matters substantively because "[w]hen the record is silent on the motivations underlying counsel's

- 5 -

tactical decisions, the appellant usually cannot overcome the strong presumption that counsel's conduct was reasonable." (Internal quotation marks omitted.) *Jones v. State*, 500 S.W.3d 106, 114 (Tex. Crim. App. 2016). That describes the case before us. Defendant's argument boils down to a disagreement about trial strategy, and strategic decisions, such as the "decision of whether and how to conduct a cross-examination," are "generally a matter of trial strategy" and thus "cannot support a claim of ineffective assistance of counsel." *People v. Tolefree*, 2011 IL App (1st) 100689, ¶ 34.

¶ 27    Before trial, defense counsel knew that the State had GSR evidence implicating defendant. And, when Officer Portis testified, he stated that, while he saw multiple muzzle flashes coming from defendant's and Fields's position, the only person whom he definitively saw firing a gun was Fields. Faced with this evidence, trial counsel embarked on an all-or-nothing defense, arguing that defendant was present when the shooting took place but did not himself fire a weapon. In pursuit of that strategy, defense counsel cross-examined the police witnesses to emphasize that (1) no one saw defendant fire a gun and (2) no one saw defendant even possess a gun. In our view, for two reasons, trial counsel may have reasonably believed that, to successfully pursue that strategy, it was necessary to limit his cross-examination of the police witnesses to those two topics. First, the strategy fit the facts and allowed trial counsel to use the State's own witnesses to repeatedly supply exculpatory testimony in support of defendant. Second, trial counsel may have feared that asking questions that strayed from his central theory of the case would have distracted the jury and taken its focus away from the exculpatory testimony the police witnesses were providing. In a similar vein, trial counsel might have also been concerned that emphasizing facts that would have shown that Officer Portis was not identifiable as a police officer would have undermined his central defense theory by telling the jury, in essence, "my client did not shoot, but if he did shoot, then he was not aware that he was shooting at a police officer." Under these facts, we are unable to conclude that trial counsel, by virtue of pursuing an all-or-nothing strategy, was " 'not functioning as the "counsel" guaranteed…by the Sixth Amendment.' " *Buck*, 580 U.S. at ___, 137 S. Ct. at 775 (quoting *Strickland*, 466 U.S. at 687).

¶ 28    Despite this, defendant suggests that trial counsel was ineffective because, by pursuing an all-or-nothing strategy, he neglected to present evidence that would have enabled the jury to find defendant did not know Officer Portis was a police officer and thus return a verdict on the lesser included offense of straight attempt murder. We do not agree. First, because the State itself presented enough evidence to enable a reasonable juror to have reasonable doubt as to whether defendant knew he was shooting at a police officer, trial counsel, as we explained above, may have concluded that additional questions were unnecessary and would have actually been detrimental to the defense.

¶ 29    Second, defendant's argument would be viable only if we could assume it is *per se* unreasonable to pursue an all-or-nothing defense when the jury has received a lesser included offense instruction. But that is not the law. To the contrary, this court has repeatedly recognized that the decision to pursue an all-or-nothing defense is a "valid trial strategy." *People v. Walton*, 378 Ill. App. 3d 580, 589 (2007). And, we have explained, "[t]he mere fact that an 'all-or-nothing' strategy proved unsuccessful does not mean counsel performed unreasonably and rendered ineffective assistance." *People v. Fields*, 2017 IL App (1st) 110311-B, ¶ 28. Rather, this court has explained, an "all or nothing" strategy may be unreasonable only if it (1) was "based upon counsel's misapprehension of the law" (*Walton*,

378 Ill. App. 3d at 589) or (2) was the functional equivalent of withdrawing a lesser-included offense instruction (*People v. Shamlodhiya*, 2013 IL App (2d) 120065, ¶ 20). But neither criterion applies here. As to the first, defendant has not argued that trial counsel's strategy resulted from a misunderstanding of the law. As to the second, defendant does argue that trial counsel abandoned the lesser included offense instruction, but that argument ignores the fact that the State elicited evidence that supported the instruction. And more importantly, the argument distorts the record. During closing argument, trial counsel explicitly argued that it was questionable whether Officer Portis was not recognizable as a police officer at the time of the shooting:

> "Marvin Fields engaged into [*sic*] gunfight with a person that is in plainclothes, which is not as clear as day that he is an officer. Let's clear that up right now. It is not clear as day that he is an officer. He was on a violence suppression mission in the area wearing plainclothes so that he could blend in the area to suppress crime in a high crime area."

Under these facts, trial counsel's strategic decision to pursue an all-or-nothing defense did not deprive defendant of his right to the effective assistance of counsel.

¶ 30    In his reply brief, defendant suggests trial counsel's failure to elicit testimony that would have supported a finding of guilt on the lesser include offense was unreasonable because defendant "specifically chose not to pursue an all-or-nothing defense" by requesting the lesser included offense instruction. This argument fails. To begin, it ignores the facts that (1) the State itself elicited evidence germane to the lesser included offense instruction, and (2) trial counsel actually emphasized that exact evidence during closing argument. But more to the point, it is based on a faulty premise, namely that to function as "counsel" as the sixth amendment understands that term, an attorney must deviate from his planned trial strategy when his client requests a lesser included offense instruction. We are unaware of any precedent so holding, and in fact the United States Supreme Court has suggested that the opposite holds true. In *Faretta v. California*, 422 U.S. 806, 820 (1975), the Court explained that "when a defendant chooses to have a lawyer manage and present his case, law and tradition may allocate to the counsel the power to make binding decisions of trial strategy in many areas." And in *New York v. Hill*, 528 U.S. 110, 114-15 (2000), it explained that because defense attorneys "must have *** full authority to manage the conduct of the trial," their decisions "are generally given effect as to what arguments to pursue [citation], what evidentiary objections to raise [citation], and what agreements to conclude regarding the admission of evidence." (Internal quotation marks omitted.)

¶ 31    Consistent with that principle, the Illinois Supreme Court has explained that, with the exception of five specific decisions—the decision to file an appeal, enter a plea, waive a jury trial, testify, and submit a lesser included offense instruction—"trial counsel has the right to make the ultimate decision with respect to matters of tactics and strategy after consulting with his client." (Internal quotation marks omitted.) *People v. Brocksmith*, 162 Ill. 2d 224, 228 (1994).

¶ 32    In the face of this authority, defendant has not cited any case, and we have found none ourselves, holding that defense attorneys have an absolute duty to alter their trial strategy when the defendant requests a lesser included offense instruction. If anything, the opposite seems to be true. See *id.* at 229 (holding that defendants are entitled to make strategic decision of whether to submit a lesser included offense instruction after "the conclusion of the evidence"); see also *Strickland*, 466 U.S. at 689 (admonishing that lower courts considering claims under

the Counsel Clause refrain from second-guessing trial counsel and instead "indulge a strong presumption *** that, under the circumstances, the challenged action 'might be considered sound trial strategy' " (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955))); *Kelly v. Lazaroff*, 846 F.3d 819, 830 (6th Cir. 2017) (rejecting ineffective assistance claim that argued that defense attorney should have pursued defense of mitigation in murder trial by emphasizing certain testimony). We therefore reject defendant's claim that trial counsel was ineffective for failing to more vigorously pursue a trial strategy that accommodated the lesser-included offense instructions.

¶ 33    Defendant cites *People v. King*, 316 Ill. App. 3d 901 (2000), *People v. Bell*, 152 Ill. App. 3d 1007 (1987), and *People v. Solomon*, 158 Ill. App. 3d 432 (1987), but each case is inapposite. In *King*, an attorney performed deficiently because he failed to call the only witness who could have corroborated the defendant's defense. *King*, 316 Ill. App. 3d at 916. In *Bell*, the attorney failed to investigate seven witnesses who could have given crucial testimony about the defendant's victim that would have corroborated the defendant's otherwise uncorroborated self-defense claim. *Bell*, 152 Ill. App. 3d at 1013. And in *Solomon*, the defendant argued entrapment but the lawyer failed to call the only witness who could have corroborated the defense. *Solomon*, 158 Ill. App. 3d at 436.

¶ 34    Defendant's next claim relates to testimony the State elicited from Officers Portis, Dennis, and Skarupinski. Specifically, the State asked them if they had received any police awards or commendations. Officers Portis, Dennis, and Skarupinski testified that they had received various commendations, medals, and awards, many of which bore impressive names. Defendant argues that trial counsel was ineffective for failing to object to this testimony because it was irrelevant and improperly bolstered the police witnesses in the eyes of the jury while diminishing defendant.

¶ 35    "A defendant's guilt must be established by legal and competent evidence, uninfluenced by bias or prejudice raised by irrelevant evidence." *People v. Bernette*, 30 Ill. 2d 359, 371 (1964). The determination of whether evidence was "legal and competent" hinges, in turn, on whether the evidence was relevant and admissible. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Ill. R. Evid. 401 (eff. Jan. 1, 2011). And relevant evidence is admissible so long as its probative value is not substantially outweighed by the danger that it will unduly prejudice the party against whom it is admitted. Ill. R. Evid. 403 (eff. Jan. 1, 2011).

¶ 36    In *People v. Roman*, 323 Ill. App. 3d 988, 998-99 (2001), this court held that evidence about the awards a police officer had received was irrelevant to the issue of defendant's guilt or innocence and awarded the defendant relief under the plain-error doctrine. Although defendant has raised this issue under the rubric of ineffective assistance of counsel rather than plain error, the distinction is immaterial. See *People v. Wood*, 2014 IL App (1st) 121408, ¶ 56. Here, evidence about the police officers' awards was irrelevant to any of the issues at trial. Thus, a Rule 401 objection to this evidence would have been sustained. Moreover, even if the evidence had some iota of relevance, trial counsel could have still objected based on Rule 403 because the introduction of this evidence carried a substantial risk of inducing the jury to feel sympathy and camaraderie with the testifying police officers.

¶ 37    Citing *People v. Evans*, 209 Ill. 2d 194 (2004), the State suggests that trial counsel's decision not to object may have been tactical move born out of a desire not to draw undue

attention to this testimony. But in *Evans*, the statement at issue was "isolated and cryptic." *Id.* at 221. The same cannot be said for the testimony at issue here, as the State asked multiple police witnesses to testify about their awards and commendations. Moreover, the suggestion that this was a tactical decision rings hollow since an objection at the outset would have prevented any of this evidence from reaching the jury.

¶ 38    Since defendant has established deficiency, we must consider whether trial counsel's error prejudiced defendant. To establish prejudice, defendant must show that there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. Defendant cannot make this showing. The evidence established that (1) defendant was present at the scene of the shooting, (2) Officer Portis saw multiple muzzle flashes, (3) defendant was seen leaving the scene of the shooting, (4) as he left he discarded a jacket and gloves he was wearing despite it being nighttime in the dead of winter, (5) the police recovered the jacket and gloves and subjected them to forensic testing, (6) which revealed the presence of GSR on the jacket and one of the gloves, (7) defendant actively fled when he became aware the police were nearby, and (8) defendant vigorously resisted arrest despite being engaged by four police officers. Under these facts, we do not believe the evidence about the officers' awards affected the outcome of defendant's trial. As such, his *Strickland* claim fails.

¶ 39    We next consider defendant's argument that trial counsel was ineffective for failing to object to certain comments during the State's closing argument. "A prosecutor has wide latitude in making a closing argument and is permitted to comment on the evidence and any fair, reasonable inferences it yields." *People v. Glasper*, 234 Ill. 2d 173, 204 (2009). "[C]losing arguments must be viewed in their entirety, and the challenged remarks must be viewed in context." *People v. Wheeler*, 226 Ill. 2d 92, 122 (2007). When reviewing comments made during closing argument, the relevant question is whether the prosecutor's comments "engender substantial prejudice against a defendant such that it is impossible to say whether or not a verdict of guilt resulted from them." *Id.* at 123. Substantial prejudice exists when "the improper remarks constituted a material factor in a defendant's conviction." *Id.* "If the jury could have reached a contrary verdict had the improper remarks not been made, or the reviewing court cannot say that the prosecutor's improper remarks did not contribute to the defendant's conviction, a new trial should be granted." *Id.*

¶ 40    During closing argument, the State argued, "[t]his is not Iraq. This is not Bagdad [*sic*]. But those two guys turned the streets of Roseland here in Chicago, in our city, into a war zone. They turned it into a warzone when they lit up the street and tried to kill Officer Portis." Later, the State argued:

> "He just tried to murder a Chicago police officer, a Chicago police officer that's [*sic*] job was out there to prevent that type of violence. He was on a violence suppression mission. Their entire job was to protect the citizens of this community with all of these different residences, with all of these families, at night. People are in there cooking dinner, watching TV, and this defendant and his codefendant are out there firing up the neighborhood, trying to kill Officer Portis.
>
> Officer Portis is out there trying to stop this violence, and this defendant and Defendant Fields are out creating the violence. Officer Portis' job out there was to stop what actually took place that night, that type of violence. This is a violence suppression mission zone, and they had officers out there."

Still later, the State argued:

> "Ladies and gentlemen, Officer Portis was out there doing his job that night. He was out there trying to protect the citizens of Roseland. They were out there trying to protect the citizens of Roseland from the defendant and his partner, defendant Fields. And while Officer Portis is out there trying to protect all of these people from *** this defendant and Defendant Fields, he almost got murdered."

¶ 41 Defendant contends that trial counsel should have objected to these statements because they "emphasized that, since [defendant] created a danger to Portis and the citizens of Roseland, he should be punished for his conduct, regardless of his intent." This argument is without merit. To begin, the State never argued that it did not have to prove intent. In fact, during its closing argument, it specifically argued that the volume of shots fired at Officer Portis was evidence that defendant and Fields "were trying to murder" Officer Portis.

¶ 42 More importantly, trial counsel was not ineffective for failing to object to these statements. An objection would have been futile because all of the challenged remarks were fair comments on the evidence. The statement that defendant turned Roseland into a warzone reminiscent of Baghdad, while colorful, was a fair description of the scene that unfolded at 120th and State Streets on the night of January 12, 2011: two men engaged in a gunfight with a third man on a city street, both sides ducking for cover, and bullets pinging off of parked cars caught in the crossfire. The same is true of the remaining statements. Defendant complains that the prosecutor stated that defendant tried to kill Officer Portis, but that is a fair conclusion from the evidence presented. Defendant also criticizes the State's comment that Officer Portis was on a violence suppression mission, but that was also a matter of historical fact in the case. He takes issue with the State's mentioning that Officer Portis's job was to protect Roseland, but that was an accurate statement. And finally, he assails the prosecutor for telling the jury that defendant was shooting while people in their homes nearby were eating dinner and watching TV, but that was a fair inference—the shooting was in a residential neighborhood during the evening at a time when it would be reasonable to expect people to be eating dinner or watching television.

¶ 43 We next consider defendant's argument that the State denigrated Jackson during closing argument. During its rebuttal argument, the State argued, "[t]his defendant was not dressed that evening how he is all cleaned up in court today, got the nice sweater on." Trial counsel objected, but the court overruled the objection. The prosecutor then continued, stating, "[h]e was not wearing that that night." That statement was unobjectionable because it was a fair comment on the evidence where witnesses identified the defendant based on the clothing he wore on the night in question. The trial evidence established that defendant was dressed differently than he was when sitting before the jury.

¶ 44 We next consider defendant's claim that the State denigrated the burden of proof during closing argument. Defendant's argument is predicated on the following colloquy that occurred during the State's rebuttal argument:

> "Counsel talked about the burden, beyond a reasonable doubt. That is the standard. We embrace this burden. This is what the burden is, beyond a reasonable doubt. It doesn't say no doubt. It says beyond a reasonable doubt.
>
> There is [*sic*] prisons filled throughout America with people that have been found guilty beyond a reasonable doubt.
>
> [TRIAL COUNSEL]: Objection.

THE COURT: Objection sustained.

[ASSISTANT STATE'S ATTORNEY]: It is not an insurmountable burden. It is a burden that we embrace."

¶ 45    To obtain a conviction, the State must prove every element of the offense beyond a reasonable doubt. *In re Winship*, 397 U.S. 358, 361 (1970). Thus, the State may not offer arguments to the jury that "reduce the State's burden of proof to a *pro forma* or minor detail." *People v. Speight*, 153 Ill. 2d 365, 374 (1992) (citing *People v. Eddington*, 129 Ill. App. 3d 745, 780 (1984)).

¶ 46    Illinois courts have repeatedly held that comments similar to those uttered by the prosecutor in the present case are proper. For example, in *People v. Collins*, 106 Ill. 2d 237, 277 (1985), the Illinois Supreme Court held that the following statement was not improper:

> " 'That is the same burden of proof in every case that is tried in this courtroom, every case that is tried in this county, and every case that is tried in this country. It is beyond a reasonable doubt. The penitentiary is full of people like Collins and Bracey who have been proved guilty beyond a reasonable doubt.' "

Similar comments were upheld in *People v. Bryant*, 94 Ill. 2d 514, 523 (1983), and *People v. Harris*, 129 Ill. 2d 123, 159 (1989). We therefore reject defendant's contention of error.

¶ 47    We next address defendant's claim that the 15-year firearm enhancement does not apply to the offense of attempted murder of a peace officer. Defendant concedes that he failed to preserve this issue, but we may consider it as plain error because "the right to be lawfully sentenced is substantive, as it affects a prisoner's fundamental right to liberty." (Internal quotation marks omitted.) *People v. Ritchey*, 286 Ill. App. 3d 848, 852 (1997). To determine whether the firearm enhancements apply, we must interpret section 8-4(c) of the Criminal Code of 1961 (720 ILCS 5/8-4(c) (West 2010)). We perform that task *de novo*. *People v. Young*, 2011 IL 111886, ¶ 10.

¶ 48    "When construing a statute, this court's primary objective is to ascertain and give effect to the legislature's intent, keeping in mind that the best and most reliable indicator of that intent is the statutory language itself, given its plain and ordinary meaning." *Id.* ¶ 11. When interpreting a statute with unambiguous terms, our role is to merely apply the statute as drafted by the legislature. *Solon v. Midwest Medical Records Ass'n*, 236 Ill. 2d 433, 440 (2010); see *People v. Glisson*, 202 Ill. 2d 499, 505 (2002) ("Only where the language of the statute is ambiguous may the court resort to other aids of statutory construction.").

¶ 49    Section 8-4(c)(1) states:

> "(c) Sentence.
>
> A person convicted of attempt may be fined or imprisoned or both not to exceed the maximum provided for the offense attempted but, except for an attempt to commit the offense defined in Section 33A-2 of this Code:
>
> > (1) the sentence for attempt to commit first degree murder is the sentence for a Class X felony, except that
> >
> > > (A) an attempt to commit first degree murder when at least one of the aggravating factors specified in paragraphs (1), (2), and (12) of subsection (b) of Section 9-1 is present is a Class X felony for which the sentence shall be a term of imprisonment of not less than 20 years and not more than 80 years;

- 11 -

(B) an attempt to commit first degree murder while armed with a firearm is a Class X felony for which 15 years shall be added to the term of imprisonment imposed by the court;

(C) an attempt to commit first degree murder during which the person personally discharged a firearm is a Class X felony for which 20 years shall be added to the term of imprisonment imposed by the court;

(D) an attempt to commit first degree murder during which the person personally discharged a firearm that proximately caused great bodily harm, permanent disability, permanent disfigurement, or death to another person is a Class X felony for which 25 years or up to a term of natural life shall be added to the term of imprisonment imposed by the court; and

(E) if the defendant proves by a preponderance of the evidence at sentencing that, at the time of the attempted murder, he or she was acting under a sudden and intense passion resulting from serious provocation by the individual whom the defendant endeavored to kill, or another, and, had the individual the defendant endeavored to kill died, the defendant would have negligently or accidentally caused that death, then the sentence for the attempted murder is the sentence for a Class 1 felony[.]" 720 ILCS 5/8-4(c)(1) (West 2010).

¶ 50     We find, based on section 8-4(c)(1)'s text and structure, that the firearm enhancements contained in sections 8-4(c)(1)(B) through (D) may be applied to a sentence for attempted murder of a peace officer under section 8-4(c)(1)(A). Section 8-4(c)(1) begins with a general rule: the sentence for attempted murder is the sentence for a Class X felony, which is 6 to 30 years. *Id.*; 730 ILCS 5/5-4.5-25(a) (West 2010). But instead of ending with a period, section (c)(1)'s general rule is followed by the phrase "except that," which in turn has no following punctuation. After the phrase "except that," section (c)(1)'s five subsections appear. The first subsection, section (c)(1)(A), states that an attempt to commit first degree murder when one of three aggravating factors contained in section 9-1 of the Code are present, such as the victim being a peace officer, is a Class X felony with an enhanced sentencing range, namely 20 to 80 years, as opposed to the baseline Class X range of 6 to 30 years. 720 ILCS 5/8-4(c)(1)(A) (West 2010). This subsection clearly demonstrates that the General Assembly intended to punish attempted murder of peace officers more harshly by (1) defining attempted murder of a peace officer as a Class X felony and (2) prescribing an enhanced sentencing range for the offense.

¶ 51     Section (c)(1)(A) is punctuated with a semicolon rather than a period. That makes matters somewhat more complicated because semicolons typically precede a related but separate concept. That suggests that section (c)(1)'s subsections must be read disjunctively, so that only one subsection can apply to a given case. But there is reason to believe that the General Assembly did not use semicolons to signify a disjunctive intent. Before subsection (E) of section 8-4(c)(1)—the last of the attempted murder subsections—there is subsection (D), and subsection (D) ends with a semicolon followed by the word "and." That—the use of the word "and" at the end of series of subsections each ending in a semicolon—signals that the General Assembly intended for section (c)(1)'s exceptions to apply conjunctively, not disjunctively.

¶ 52     The statute's plain text supports this interpretation. Section (c)(1)(A) defines the attempted murder of a police officer as a Class X felony and prescribes a sentencing range. Subsections

(B) through (D), by contrast, describe attempted murder when a firearm is involved as a Class X felony "for which" a certain period of years "shall be added to the term of imprisonment imposed by the court." See, *e.g.*, 720 ILCS 5/8-4(c)(1)(B) (West 2010). The most natural reading of section (c)(1) is that subsection (A) sets out an enhanced baseline sentencing range for attempted murder of a peace officer, and then, depending on the facts of the case, subsections (B), (C), or (D) come into play and require that the circuit court add time to the sentence. See *People v. Smith*, 2012 IL App (1st) 102354, ¶ 114 ("Just as the firearm sentencing enhancements in subsections (c)(1)(B), (C), and (D) must be added to the 6- to 30-year sentencing range, so too must those enhancements be added to the higher 20- to 80-year sentencing range.").

¶ 53    Defendant suggests that interpreting section (c)(1)'s exceptions as applying conjunctively creates the possibility that a defendant who attempts to kill someone using a gun and causes great bodily harm could be subjected to all three firearm enhancements, since to injure someone with a gun, one must necessarily possess a gun and fire it. We disagree. As a general matter, this court will not interpret a statute as permitting double enhancements. *People v. Guevara*, 216 Ill. 2d 533, 545 (2005). The only time that prohibition may be lifted is if "the legislature clearly intends for there to be a double enhancement, and that intention is clearly expressed" in the statute itself. *Id.* at 545-46. But section 8-4(c)(1) "says what it says—or perhaps better put here, does not say what it does not say" (*Cyan, Inc. v. Beaver County Employees Retirement Fund*, 583 U.S. ___, ___, 138 S. Ct. 1061, 1069 (2018))—and here, nothing in section 8-4(c)(1)'s plain text contains a statement of legislative approval sanctioning double enhancements. See *People v. Laubscher*, 183 Ill. 2d 330, 337 (1998) (penal statutes "must be strictly construed in favor of the accused, and nothing should be taken by intendment or implication beyond the obvious or literal meaning of the statute"). As such, defendant's fear of a double enhancement is unfounded.

¶ 54    We note that in *People v. Douglas*, 371 Ill. App. 3d 21, 26 (2007), a panel of this court reached a contrary result, stating that section (c)(1)'s firearm enhancements did not apply to attempted murder of a police officer. However, a subsequent panel of this court has explained that the *Douglas* court's analysis of section 8-4(c) was *dicta*. *People v. Tolentino*, 409 Ill. App. 3d 598, 606 (2011) (finding *Douglas*'s discussion of section 8-4(c) *dicta* and explaining that "[t]he main issue in *Douglas* concerned the retroactive application of *People v. Sharpe*, 216 Ill. 2d 481 (2005), to the defendant's sentence"). Moreover, we find the *Douglas* court's analysis unpersuasive. In *Douglas*, the court reasoned that, "[b]y creating a Class X offense carrying 20 to 80 years, the legislature well might have believed it was authorizing trial judges to impose severe sentences. That is, the sentence already is enhanced, without the need for further provision." *Douglas*, 371 Ill. App. 3d at 26. That reasoning is inconsistent with our traditional mode of statutory construction. When, as here, the General Assembly's intent "can be ascertained from the statute's plain language, that intent must prevail without resort to other interpretive aids." *Paris v. Feder*, 179 Ill. 2d 173, 177 (1997).

¶ 55    We next consider defendant's argument that the firearm enhancement was improperly imposed because it was not properly alleged in the indictment or submitted to the jury as an aggravating factor. Defendant argues that since the factor used to enhance his sentence—being armed with a firearm (see 720 ILCS 5/8-4(c)(1)(B) (West 2010))—is not an element of the offense, the State was obligated to (1) include the enhancing factor in the indictment, (2) submit the enhancing fact to the jury, and (3) prove the enhancing fact beyond a reasonable

- 13 -

doubt. Defendant maintains that the State did none of those things and so concludes that the circuit court improperly assessed the 15-year enhancement against him. We disagree.

¶ 56    The sixth amendment provides that criminal defendants "shall enjoy the right to *** trial, by an impartial jury." U.S. Const., amend. VI. In *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000), the United States Supreme Court held that the right to trial by jury encompasses the requirement that, with the exception of the fact of a prior conviction, "any fact that increases the penalty for a crime beyond the prescribed statutory maximum *** be submitted to a jury, and proved beyond a reasonable doubt." In response to that decision, the General Assembly amended section 111-3 of the Code of Criminal Procedure by adding section (c-5), which provides:

> "[I]n all cases in which the imposition of the death penalty is not a possibility, if an alleged fact (other than the fact of a prior conviction) is not an element of an offense but is sought to be used to increase the range of penalties for the offense beyond the statutory maximum that could otherwise be imposed for the offense, the alleged fact must be included in the charging instrument or otherwise provided to the defendant through a written notification before trial, submitted to a trier of fact as an aggravating factor, and proved beyond a reasonable doubt." 725 ILCS 5/111-3(c-5) (West 2002).

¶ 57    Without more, we would be inclined to agree with defendant, since, strictly speaking, the attempted first degree murder indictment did not allege that defendant was armed with a firearm. But "[i]t is a well-established rule in Illinois that all counts of a multiple-count indictment should be read as a whole and that elements missing from one count of an indictment may be supplied by another count." *People v. Morris*, 135 Ill. 2d 540, 544 (1990); see *People v. Wade*, 2015 IL App (3d) 130780, ¶ 28. Here, defendant's indictment for attempted murder alleged he "shot at" Officer Portis. Although that language is ambiguous—it does not differentiate whether defendant shot a bullet, a BB, or an arrow at Officer Portis—the remainder of the indictment filled in the gap. Defendant was also charged with aggravated discharge of a firearm and aggravated unlawful use of a weapon, and the indictment for those crimes alleged, respectively, that defendant "knowingly discharged a firearm," and "knowingly carried on or about his person a firearm." Therefore, defendant's indictment sufficiently placed him on notice that he was being accused of carrying a firearm when the offense took place.

¶ 58    Likewise, the fact that defendant was carrying a firearm was submitted to and decided by the jury. At trial, the State's only theory was that defendant fired a gun at Officer Portis (recall, too, that the attempt first degree murder indictment alleged that defendant "shot at" Officer Portis), and the jury found defendant guilty of attempted first degree murder. That means the jury must have believed that defendant shot a gun at Officer Portis, which in turn means that the jury must have found that defendant was "armed with a firearm." 720 ILCS 5/8-4(c)(1)(B) (West 2010); see *People v. Jackson*, 2014 IL App (1st) 123258, ¶ 62 ("It is impossible for an individual to pull the trigger of a firearm without simultaneously being armed with a firearm.").

¶ 59    Moreover, even assuming that there was an *Apprendi* error, defendant would still not be entitled to relief. *Apprendi* errors are subject to harmless error analysis. *Washington v. Recuenco*, 548 U.S. 212, 221-22 (2006); *People v. Rivera*, 227 Ill. 2d 1, 27 (2007). To determine if a constitutional error such as an *Apprendi* error was harmless, we must ask whether it is " 'clear beyond a reasonable doubt that a rational jury would have found the

- 14 -

defendant guilty absent the error.' " *People v. Thurow*, 203 Ill. 2d 352, 368-69 (2003) (quoting *Neder v. United States*, 527 U.S. 1, 18 (1999)). Here, we find that any error was harmless beyond a reasonable doubt. Officer Portis testified that he saw multiple muzzle flashes from the direction of Fields and defendant. The police recovered 15 shell casings from the scene of the shooting, and a forensic analysis revealed that they came from two different firearms. Moreover, defendant was observed fleeing from the scene, and as he fled, he discarded items of clothing which tested positive for GSR. And when defendant finally came face to face with the police, he vigorously resisted. Based on the totality of the evidence presented at trial, the State proved beyond a reasonable doubt that defendant was armed with a firearm at the time of the offense. Accordingly, any *Apprendi* error that occurred in this case was harmless beyond a reasonable doubt.

¶ 60　　Finally, defendant argues that certain entries relating to fines and fees on his mittimus need to be corrected. Extended discussion of this issue is unnecessary and inappropriate given its trivial nature as well as the fact it could have easily been corrected in the circuit court. See *People v. Smith*, 2018 IL App (1st) 151402, ¶ 8 ("Given that the parties have 30 days to return to the trial court to make corrections [to the mittimus], this court should not be the court of first resort for [fines and fees] issues."). We order two corrections to the mittimus. First, the mittimus credits defendant with 1285 days of presentence credit. See 730 ILCS 5/5-4.5-100(a) (West 2014). Defendant was arrested on January 12, 2011 and released on January 13, 2011. He was rearrested on July 11, 2011, and sentenced on January 15, 2015. Defendant should have been credited with 1287 days of presentence credit. We correct the mittimus to so reflect.

¶ 61　　Second, defendant was assessed $679 in fines and fees. However, the circuit court erroneously imposed a $5 electronic citation fee (705 ILCS 105/27.3e (West 2014)) because attempted murder of a peace officer is not a traffic, misdemeanor, municipal ordinance, or conversation case. We vacate this fee. We further order that defendant's presentence incarceration credit be applied to offset a $15 state police operations fee and a $50 court system fee because these fees are actually fines. *People v. Brown*, 2017 IL App (1st) 142877, ¶¶ 71, 74. Defendant further maintains that he is entitled a presentence credit for a $2 public defender records automation fee and a $2 state's attorney records automation fee. This court has repeatedly held that these fees are in fact fees and thus not subject to offset. *People v. Bowen*, 2015 IL App (1st) 132046, ¶¶ 64-65. In sum, we correct defendant's fines and fees order to reflect a new total of $609 in fines and fees.

¶ 62　　　　　　　　　　　　　　　　CONCLUSION

¶ 63　　We affirm defendant's conviction and sentence and correct the mittimus.

¶ 64　　Affirmed; mittimus corrected.