2019 IL App (1st) 161404-U

No. 1-16-1404

December 16, 2019

First Division

**NOTICE**: This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 11 CR 18697 |
| | ) | |
| WILLIAM WRIGHT, | ) | Honorable |
| | ) | Joan Margaret O'Brien, |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

JUSTICE WALKER delivered the judgment of the court.
Justices Hyman and Pierce concurred in the judgment.

**ORDER**

¶ 1     *Held*:  When a prosecutor uses five of his seven peremptory challenges to excuse 50% of the available Black venire members from the jury, and only one challenge to excuse 8% of available White venire members, and the five excused Black persons form a heterogeneous group with no obvious common trait other than race, the defendant has made a *prima facie* case for racial discrimination in jury selection.

¶ 2     A jury found William Wright guilty of attempting to murder a police officer.  On appeal,

Wright argues the evidence does not prove an intent to kill, and the court erred in holding that he

failed to make a *prima facie* showing of racial discrimination in the prosecutor's exercise of peremptory challenges. We find the evidence sufficient to convict, but we find that Wright made a *prima facie* showing that the prosecutor violated *Batson v. Kentucky*, 476 U.S. 79, 94-96 (1986). We remand to the trial court for further proceedings on the *Batson* claim.

¶ 3                                    I. BACKGROUND

¶ 4    On October 13, 2011, Officer Matthew O'Brien drove his squad car toward a group of young men walking south in a parking lot just north of 132nd Street in Altgeld Gardens. Wright took off running when police approached. O'Brien's passenger, Officer James Bansley, exited the squad car and chased Wright through a courtyard south of 132nd Street. Wright, sprinting westbound, pulled out a revolver and fired two or three shots in Bansley's direction. One bullet passed through Bansley's thigh. O'Brien, in the squad car, followed Wright into a nearby parking lot, where O'Brien arrested Wright.

¶ 5    Cameras in Altgeld Gardens recorded videos showing Wright shooting and then tossing the revolver into a sewer. Police, using a magnet, retrieved the revolver from the sewer. Wright gave a handwritten statement at the police station. In the statement, Wright admitted that he ran from Bansley and O'Brien because he had a gun, marijuana, and an outstanding warrant from Michigan. Wright said that he tossed the marijuana right away, but he did not immediately toss the gun because he thought officers would find it quickly. Wright admitted that as "he ran straight ahead with his arm outstretched in the direction of the officer," he "fired two to three times at the officer." Prosecutors charged Wright with attempted first degree murder of a police officer, aggravated battery with a firearm causing bodily harm and other gun related charges.

¶ 6     Defense counsel sought discovery of citizen's complaints lodged against Bansley and O'Brien.  The trial court ordered the Independent Police Review Authority to produce, for *in camera* inspection, reports and statements relating to allegations of brutality or harassment by Bansley or O'Brien.  The court summarized 10 complaints, and gave defense counsel access to 4 of the files.

¶ 7     The court later held that Wright could not subpoena any of the witnesses or complainants in the prior complaints.  The court held that because Bansley did not draw his weapon, Wright could not present evidence in support of a claim of self-defense.  Defense counsel made an offer of proof, stating:

> "[Wright] would testify that he knew these officers *** from his prior contact where they stopped him as he was walking down the street for no reason.  *** [Bansley and O'Brien] beat people up in his neighborhood.  One of those people was [Wright's] cousin; that they have stopped people and they have planted drugs on these people."

¶ 8     The court barred Wright (1) from presenting other witnesses to support his allegations of misconduct by Bansley and O'Brien, and (2) from testifying "that he has been stopped for no reason, *** that the police officers are known for beating people up including his cousin and they stop people and plant drugs on them."

¶ 9     Jury selection took place on August 24, 2015.  The court questioned 36 members of the venire.  Defense counsel asserted that 14 of the questioned persons counted as Black, 7 counted as Latinx, and 15 counted as white.  The court counted one more Black and one fewer Latinx person.  The court struck 5 Blacks for cause, including one who said that five months earlier a

man shot her son. She said, "when I see [Wright], I see my son, so it would be very hard for me to judge him because the person that shot my son, mother is a sheriff. They gave him *** house arrest and if it was on the other foot my son would be sitting in jail right now instead of house arrest, so I couldn't judge this because I would be biased." Another Black woman said that before she found work as a teacher, she worked in a fast food restaurant that was robbed several times. She said, "The policemen ask me what color the people that did this to us, so I don't want to be a juror. *** I am very afraid of police officers right now." The parties and the court agreed to excuse her because she thought she recognized Wright. The court also struck two whites and one Latinx for cause, leaving, by the court's count, 10 Blacks, 13 whites, and 5 Latinx available for the jury.

¶ 10    The prosecutor used all seven allotted peremptory challenges, using one to strike a white person, one to strike a Latinx person, and five to strike Black persons. Defense counsel made a *Batson* motion. The court found that Wright had not met his burden of presenting a *prima facie* case for finding that the prosecutor discriminated on the basis of race in the exercise of peremptory challenges.

¶ 11    One of the Black persons selected to serve on the jury injured herself, and the court excused her from service before the trial began, leaving four Blacks (by the court's count), or three (by defense counsel's count), on the jury that deliberated.

¶ 12    At the trial, Bansley explained that the police department considered Altgeld Gardens a "hot spot" for crime. He and O'Brien decided to approach the young men on the sidewalk "to see what they were up to." As Bansley chased Wright, Wright "suddenly *** turned his head and body towards [Bansley], and extended his right arm and fired several shots" from a distance of

15 or 20 feet. The jurors watched several videos of the chase, the shooting, the discarding of the gun, and the arrest. A witness read to the jury the statement Wright signed at the police station. The jury heard evidence corroborating Wright's admission that a Michigan court had issued a warrant for his arrest. Wright did not testify. The jury found him guilty of attempted murder of a police officer and aggravated battery to a police officer.

¶ 13    In his motion for a new trial, Wright again contested the ruling barring evidence of O'Brien's and Bansley's past misconduct and the ruling on the *Batson* motion. The court said:

> "[One Black woman] got a relative out of jail on a gun charge[] that was later dropped ***. [Another Black woman] had a friend who was a Defense attorney and said it was the Defense attorney's job to present reasonable doubt, and the last African-American female *** said she never called the police after her home was vandalized ***.
>
>     *** [A]nother African-American[] said she was a member of a social justice organization and that her husband was attacked and did not call the police, and [prosecutors used another strike against] an African-American male [who] was very young. He was 20 years old. I find that these jurors were not a he[t]erogeneous group ***. I find that the Defense did not meet the prima facie threshhold."

¶ 14    To clarify the court's comment: the prosecutor asked all venire members whether they had "ever stepped foot into a jail or a prison." Several, including those the prosecutor did not strike, visited jails and prisons for work or to see friends and relatives. One white man the

prosecutor did not strike had served time in jail. The woman subjected to the peremptory strike had gone to the jail to pick up relatives when the jail released them.

¶ 15    The court denied the motion for a new trial. At the sentencing hearing, the court noted a conflict between appellate court decisions on the correct interpretation of section 5/8-4(c)(1) of the Criminal Code (720 ILCS 5/8-4(c)(1) (West 2010)), pertaining to sentencing for attempted murder. See *People v. Holley*, 2019 IL App (1st) 161326, ¶¶ 26-33; *People v. Jackson*, 2018 IL App (1st) 150487, ¶¶ 49-52. The trial court adopted the interpretation that permitted two enhancements to the usual punishment for attempted murder (see *Jackson*, 2018 IL App (1st) 150487, ¶¶ 49-52), and imposed on Wright a sentence of 60 years in prison. The court denied Wright's motion to reconsider the sentence. Wright now appeals.

¶ 16                                II. ANALYSIS

¶ 17    On appeal, Wright contends that: (1) the evidence does not prove he intended to kill Bansley; (2) the trial court should have found that he presented a *prima facie* case of racial discrimination in jury selection; (3) prosecutors committed prejudicial misconduct in both opening statements and closing arguments; (4) the court erred by allowing into evidence the Michigan warrant for Wright's arrest; (5) the court erred by barring Wright from presenting evidence about past misconduct of Bansley and O'Brien; and (6) the judge misinterpreted the sentencing statute and imposed an excessive sentence.

¶ 18                        A. Sufficiency of the Evidence

¶ 19    We will not reverse a conviction due to insufficient evidence unless the evidence as a whole, viewed in the light most favorable to the prosecution, would not permit any rational trier of fact to find all the elements of the offense proven beyond a reasonable doubt. *People v. Ross*,

229 Ill. 2d 255, 272 (2008). Wright admits that he fired a gun directed generally towards Bansley. He argues that the evidence cannot support an inference that he intended to kill because he shot without aiming while running.

¶ 20    "Intent is a state of mind which, if not admitted, can be established by proof of surrounding circumstances, including the character of the assault, the use of a deadly weapon, and other matters from which an intent to kill may be inferred." *People v. Green*, 339 Ill. App. 3d 443, 451 (2003). "The very fact of firing a gun at a person supports the conclusion that the person doing so acted with an intent to kill." *People v. Ephraim*, 323 Ill. App. 3d 1097, 1110 (2001). Here, Wright argues that he shot wildly, but the handwritten statement he signed supports the inference that he shot two or three times at Bansley, and Bansley's testimony that defendant fired his weapon at him first supports the evidence of an intent to kill or do great bodily harm. A rational trier of fact could find the evidence sufficient to prove that Wright intended to kill Bansley when he shot his gun in the direction of Bansley striking him in the knee. We find the evidence sufficient to sustain the conviction.

¶ 21                                B.  Batson

¶ 22    Next, Wright challenges the trial court's finding that he failed to present a *prima facie* case for racial discrimination in the prosecutor's exercise of peremptory challenges. We review the trial court's finding "to determine if the trial judge's ruling is against the manifest weight of the evidence." *People v. Andrews*, 146 Ill. 2d 413, 428 (1992). A ruling is against the manifest weight of the evidence when the opposite conclusion would be evident to a reasonable, unbiased person. *People v. Miles*, 343 Ill. App. 3d 1026, 1030 (2003).

¶ 23    "[T]he threshold for making out a *prima facie* claim under *Batson* is not high." *People v. Davis*, 231 Ill. 2d 349, 360 (2008).   The court must consider the totality of the relevant facts *Batson*, 476 U.S. at 94.   The court may perform a comparative juror analysis, in which the court examines "a prosecutor's questions to prospective jurors and the jurors' responses, to see whether the prosecutor treated otherwise similar jurors differently because of their membership in a particular group." *Davis*, 231 Ill. 2d at 361. If "a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination." *Miller-El v. Dretke*, 545 U.S. 231, 241 (2005).   The *Davis* court said:

> "We see no reason why a comparative juror analysis would not also be a relevant factor in the totality of factors that must be considered in determining whether a *prima facie* case exists in the first instance. \*\*\*
>
> In addition to comparative juror analysis, the following factors are also relevant in evaluating whether a *prima facie* case exists: [new line, indented](1) the racial identity between the party exercising the peremptory challenge and the excluded venirepersons; (2) a pattern of strikes against African-Americans on the venire; (3) a disproportionate use of peremptory challenges against African-Americans; (4) the level of African-American representation in the venire compared to the jury; (5) the prosecutor's questions and statements of the challenging party during *voir dire* examination and while exercising peremptory challenges; (6) whether the excluded African-American venirepersons were a

heterogeneous group sharing race as their only common characteristic; and (7) the race of the defendant, victim and witnesses." *Davis*, 231 Ill. 2d at 361-62.

¶ 24   In accord with *Davis*, the trial court considered the prosecutor's questions and venire members' answers, and guessed at possible reasons for the prosecutor's exercises of peremptory challenges used against Blacks.  Wright argues that the court impermissibly collapsed the several stages of *Batson* proceedings by considering reasons for peremptory challenges as part of determining whether Wright presented a prima facie case for racial discrimination.  See *People v. Wiley*, 156 Ill. 2d 464, 475 (1993).  If the court does not consider whether the venire members' answers to questions suggest possible reasons for strikes, the comparative juror analysis would appear to provide no help for determining whether a defendant has presented a *prima facie* case for a *Batson* violation.  The trial court cannot comply with *Davis* without considering possible reasons for each strike.  We find that the trial court's guesses did not collapse the stages of *Batson* proceedings, as the court never asked the prosecutor to give reasons for the strikes.

¶ 25   The trial court found possible reasons it considered adequate for each of the five strikes without hearing from the State.  One Black person picked up a relative at a jail; one knew a defense attorney and spoke of "reasonable doubt;" one was "very young;" one did not report vandalism to police; and one belonged to a social justice organization and her husband did not report a mugging to police.  The court did not complete the comparative juror analysis, as it did not consider whether nonblack venire members had similar traits.  The record shows that a nonblack man who visited prison served as an alternate juror, and the prosecutor did not strike a nonblack man who served time in jail.  The prosecutor did not strike a nonblack man whose niece worked as an attorney practicing criminal law, but he was "not sure if it's an Assistant

State's Attorney or Public Defender."   A nonblack woman in her early 20s, who still lived with her parents, and another nonblack woman still in college, both served on the jury.  A nonblack venire member told the court her home had been burglarized, and neither the court nor the prosecutor asked whether she reported the crime to police.  The prosecutor did not exercise a peremptory challenge against her.  A nonblack man who did volunteer work for a community organization served on the jury.  We find that a comparative juror analysis lends support to a finding that all the reasons the court suggested for the strikes might also apply to nonblack venire members the prosecutor chose not to strike.

¶ 26    The trial court correctly found that Wright shared his racial identity with five persons stricken from the jury by the prosecutor's exercise of peremptory challenges.

¶ 27    For the next factor, our supreme court explained that "[a] 'pattern' of strikes is created where the strikes affect members of a certain race to such a degree or with such a lack of apparent nonracial motivation that it suggests the possibility of racial motivation." *Andrews*, 146 Ill. 2d at 429.  The prosecutor used about 14% percent of his challenges to strike about 8% of the available white persons from the jury, 14% of his challenges to strike 20% of available Latinx persons, and 71% of his challenges to strike 50% (by the court's count) of available Black persons from the jury.  The large disparity in the prosecutor's strikes constitutes *prima facie* evidence of a pattern of strikes against Blacks and suggests racial motivation for the strikes.  See *People v. Harris*, 129 Ill. 2d 123, 172-73 (1989) (State's use of 15 out of 20 peremptory challenges to exclude Blacks constituted a pattern of strikes against blacks); *People v. Champs*, 273 Ill. App. 3d 502, 507 (1995) (finding a pattern of strikes where the State used three of its five peremptory challenges against Black veniremembers); *United States v. Alvarado*, 923 F.2d 253,

255 (2d Cir. 1991) (finding a *prima facie* case when the prosecution struck four out of seven minority jurors). The record shows a disproportionate use of peremptory challenges against Blacks.

¶ 28 The trial court counted 48 persons in the entire venire, including 20 the court considered Black. The court empanelled five Black jurors (four by defense counsel's count), leaving the proportion of Blacks on the jury equal to their proportion in the venire. Even if (by defense counsel's count) only three Blacks eventually deliberated on the case, we find that this factor does not support a finding of discrimination.

¶ 29 Although the court found five completely distinct reasons for the five strikes against Blacks, the court expressly found that "these jurors were not a he[t]erogeneous group." The express finding conflicts irreconcilably with the court's failure to find any common characteristic for the five apart from race. See *Wiley*, 156 Ill. 2d at 475-76. The court found only one remote similarity connecting two of the five. One woman did not report vandalism to her home, and another remained married to a man who did not report a mugging he endured. No other pair of the five excluded venire members had any significant similarity. The heterogeneity of the Blacks stricken from the jury counts in favor of finding that Wright presented a *prima facie* case of racial discrimination in the exercise of peremptory challenges.

¶ 30 Finally, Wright is Black, and Bansley and most of the witnesses are white.

¶ 31 Applying the *Davis* factors and comparative juror analysis, we find that the Black representation on the jury approximated Black representation in the venire, but all other factors, especially the disproportionate use of challenges against Blacks and the heterogeneity of the Blacks stricken, sufficiently establishes *prima facie* evidence of the possibility of racial

motivation for the prosecution's exercise of peremptory challenges. Wright presented a *prima facie* case for finding that the prosecutor violated *Batson*, and the trial court's finding of no *prima facie* case is contrary to the manifest weight of the evidence. See *Wiley*, 156 Ill. 2d at 476-77. Following *Davis*, we do not now reach Wright's other bases for seeking a new trial. *Davis*, 231 Ill. 2d at 370.

¶ 32    Wright asks us to remand the case to a different judge for evaluation of the *Batson* issue. We find that following the *Davis* procedures places the trial judge in a difficult position. "Performing a comparative analysis is problematic when, as here, the prosecutor did not provide reasons for the challenge because the trial court found no prima facie case had been established." *People v. Guerra*, 129 P.3d 321, 351 (Cal. 2006) overruled on other grounds in *People v. Rundle*, 180 P.3d 224, 287 (Cal. 2008); see *People v. Gray*, 118 P.3d 496, 511 (Cal. 2005). The judge needed to hypothesize possible reasons for each of the peremptory strikes. See *People v. Carasi*, 190 P.3d 616, 639 (Cal. 2008). Having suggested those reasons, the judge will then need to evaluate, on remand, the acceptability of the reasons she suggested. Out of an abundance of caution, we order this cause to be reassigned to a different judge on remand. Ill. Sup. Ct. R. 366(a)(5) (eff. Feb. 1, 1999).

¶ 33                                III.  CONCLUSION

¶ 34    The evidence that Wright fired his gun at least twice at Bansley striking him in the knee sufficiently supports the conviction for attempted murder of a police officer. The prosecutor's disproportionate use of 70% of his peremptory challenges against Blacks, along with the heterogeneity of the five Blacks so excluded, raises an inference of racial discrimination in the exercise of peremptory challenges. The trial court's finding that Wright failed to present a *prima*

*facie* case for a violation of *Batson* is contrary to the manifest weight of the evidence. We remand to the presiding judge for the case to be reassigned to a different judge for further proceedings on the *Batson* issue. On remand, the newly assigned judge will hear and evaluate the prosecution reasons for the peremptory challenges and conduct a proper *Batson* hearing and analysis. We retain jurisdiction to resolve any further issues following completion of the hearing on remand. We will consider other issues raised by Wright following the disposition of the *Batson* motion.

¶ 35    Remanded with directions.