NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2021 IL App (4th) 190242-U

NO. 4-19-0242

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
February 25, 2021
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Macon County |
| MATTHEW L. MOURNING, | ) | No. 11CF166 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Jeffrey S. Geisler, |
| | ) | Judge Presiding. |

JUSTICE STEIGMANN delivered the judgment of the court.
Presiding Justice Knecht and Justice Turner concurred in the judgment.

**ORDER**

¶ 1   *Held:*    The appellate court affirmed the trial court's judgment because (1) the evidence at trial was sufficient to sustain defendant's convictions and (2) trial counsel provided effective assistance.

¶ 2      Following a bench trial in January 2019, the trial court found defendant, Matthew L. Mourning, guilty of two counts of predatory criminal sexual assault of a child (720 ILCS 5/12-14.1 (West 2018)). In April 2019, the court sentenced him to seven years in prison on each count, to be served consecutively.

¶ 3      Defendant appeals, arguing (1) the State failed to prove him guilty beyond a reasonable doubt because "no evidence corroborated M.M.'s inconsistent and unlikely testimony" and (2) he received ineffective assistance of counsel because counsel did not impeach M.M. with her contradictory statements from prior trials. We disagree and affirm the trial court.

¶ 4                           I. BACKGROUND

¶ 5        Because the parties are familiar with the extensive procedural history in this case, we discuss it only as necessary to put defendant's arguments in context.

¶ 6                          A. Amended Information

¶ 7        In February 2011, the State charged defendant by information with two counts of predatory criminal sexual assault of a child (720 ILCS 5/12-14.1 (West 2010)). Defendant's first trial ended in a mistrial. At the second trial, the jury found defendant guilty of both counts, but on appeal, this court reversed defendant's convictions and remanded for further proceedings. In January 2019, the State filed a motion to amend the information, which the trial court granted. The amended information alleged that in the summer of 2002, defendant, who was 17 years of age or older, placed his finger in the vagina of M.M., his half-sister, who was less than 13 years of age at the time of the offense. Defendant's third trial resulted in the convictions at issue here.

¶ 8                          B. August 2012 Mistrial

¶ 9        In August 2012, the trial court conducted defendant's first jury trial. M.M. testified that defendant was 15 years older than M.M. When M.M. was six years of age, defendant sexually assaulted her in a bathroom in the family home and in her bedroom. M.M. testified defendant took her into the bathroom after swimming in the family pool. Defendant closed the bathroom door and placed his finger in her vagina. Defendant told M.M. it was not "something you talked about." On another occasion, M.M. was asleep when defendant entered her bedroom but awake when defendant inserted his finger into her vagina. She did not remember what defendant was wearing. M.M. testified that the sexual assaults made her feel dirty and afraid, but defendant told M.M. the sexual assaults were "normal; it was something big brothers do; and you just don't talk about it." When asked if it hurt when defendant placed his finger into M.M.'s vagina, M.M. testified it did not. M.M. was the first witness to testify at the August 2012 trial. She testified briefly before

defense counsel moved for a mistrial, and with no objection by the State, the trial court allowed the motion.

¶ 10                                  C. December 2013 Jury Trial

¶ 11          At the December 2013 jury trial, M.M. testified again about defendant sexually assaulting her in a bathroom in the family home and in her bedroom. M.M. testified that she was lying in bed because it was bedtime. She recalled defendant coming into her room. Defendant "used his fingers to penetrate [M.M.'s] vagina." M.M. did not remember what clothes defendant wore when he entered her bedroom. Although defendant told six-year-old M.M. that the sexual assaults were "not something you talk about, but it's normal," M.M. felt scared and wrong; she was afraid but not sure why. She testified she "just didn't feel right." M.M. did not tell anyone because defendant told her "it wasn't something we talked about." M.M. believed defendant "because he was my big brother." M.M. testified that the sexual assaults happened multiple times but she could not remember the details of each instance. The jury convicted defendant of both counts, and the trial court later sentenced defendant to consecutive prison terms of eight and nine years.

¶ 12                                         D. First Appeal

¶ 13          Defendant appealed, arguing that the trial court failed to conduct an adequate inquiry into his posttrial claims of ineffective assistance of counsel pursuant to *People v. Krankel*, 102 Ill. 2d 181, 464 N.E.2d 1045 (1984). This court agreed and remanded defendant's case for a new hearing pursuant to *Krankel*. See *People v. Mourning*, 2016 IL App (4th) 140270, ¶ 25, 51 N.E.3d 1122.

¶ 14          In August 2016, the trial court conducted defendant's *Krankel* hearing but found no merit to defendant's claims.

¶ 15                                    E. Second Appeal

¶ 16        Defendant appealed again, arguing (1) the State's questioning of defendant about

M.M.'s credibility was plain error, (2) M.M.'s mother improperly testified about M.M.'s reporting

of the alleged abuse, and (3) the circuit clerk improperly imposed several fines. This court affirmed

the trial court's judgment in *People v. Mourning*, 2017 IL App (4th) 160592-U.

¶ 17                          F. The Supreme Court's Supervisory Order

¶ 18        Defendant appealed to the Illinois Supreme Court, and that court ultimately vacated

this court's judgment and directed this court to consider the effect of *People v. Sebby*, 2017 IL

119445, 89 N.E.3d 675, regarding whether the evidence was closely balanced under the first prong

of the plain error doctrine and if a different result was therefore warranted. *People v. Mourning*,

No. 122306 (Ill. Sept. 27, 2017) (supervisory order).

¶ 19                          G. Reversal in Light of *Sebby*

¶ 20        In December 2017, in *People v. Mourning*, 2017 IL App (4th) 160592-UB, this

court reversed defendant's convictions and remanded for further proceedings because the State's

questioning of defendant regarding M.M.'s credibility was plain error.

¶ 21                               H. January 2019 Retrial

¶ 22        On remand, defense counsel requested the transcripts of the prior proceedings to

review in preparation for trial. In January 2019, the trial court conducted defendant's bench trial.

Immediately before trial, the State made three amendments to the two counts as follows:

(1) changed the phrase "sex organ" to "vagina," (2) established the sentencing range defendant

faced was 6 to 30 years, and (3) added language that the charges were brought within 10 years of

when M.M. turned 18 years old.

¶ 23                               1. *The State's Evidence*

¶ 24        Lynn Cooper testified that during the winter of 2010-11, she worked as a children's pastor at Life Foursquare Church. M.M. was 15 years old at that time and participated in the church's programming. That December, they began a unit called "True Love Waits," which discussed relationships prior to marriage and maintaining what the church deemed sexual purity. At the end of January 2011, M.M. spoke to Cooper and was crying and shaking. Cooper told M.M. to speak to her mother and followed up with her parents to ensure that she had done so. Cooper did not call the police at that time but spoke with police at the beginning of February 2011.

¶ 25        Marianne Mourning testified that she was M.M.'s mother and, with her husband, Martin, had two sons who were two and four years older than M.M. Defendant was her son with another man and was about 14 years older than M.M. In September 2001, the entire family and Marianne's mother moved into a two-story house in Decatur, Illinois. There were three bedrooms upstairs; one occupied by the parents, one occupied by the two young boys, and the third occupied by M.M. Meanwhile, Marianne's mother and defendant each occupied separate bedrooms on the first floor. The house had (1) a bathroom inside the parents' bedroom, (2) one at the end of the hall on the second floor, and (3) one on the first floor. The house had no pool when they moved in, but they brought one from their old house and assembled it immediately.

¶ 26        Marianne further testified that defendant had jobs some of the time while he lived at the house, including working at the Pla-Mor and Cicis Pizza. All but one of his jobs had him working during the day. Defendant was responsible for watching the other children occasionally because he was the oldest. Marianne said that during the evening of January 26, 2011, she was home and M.M. spoke to her shortly after 9:30 p.m. M.M. was crying and upset. Marianne then called Martin, who immediately came home, and they took M.M. to the police station the next day to make a report.

¶ 27 On direct examination, Marianne testified that defendant lived with them two and a half to three years and moved out in 2004. On cross-examination, Marianne said she did not remember telling the police that they removed the pool in 2005 and that defendant moved out in 2006. On redirect examination, Marianne explained that defendant moved out in 2004 but returned home in 2006 for six to eight weeks.

¶ 28 M.M. testified she was about 15 or 16 years younger than defendant. She said they were close when he lived with them because he babysat all three of the younger children. When she was 15 years old, she went through the "True Love Waits" program at church, which caused her to have "flashbacks" about defendant sexually assaulting her that made her feel as if she would never be pure. She told a friend who urged her to tell the pastor, who then told her to tell her mother.

¶ 29 M.M. testified that she never told anyone about the assaults before because for a long time she did not know it was wrong. When she later learned it was wrong, she felt ashamed, so she never spoke about it. She said that initially the events seemed normal because she did not know anything different.

¶ 30 M.M. testified that defendant would come into her bedroom and put his hand down her pants so his finger would go into her vagina. She stated she did not remember the first instance but could remember two specific instances. One instance took place after she and defendant had gone swimming in the pool. They were in their swimsuits, and defendant locked them in the upstairs bathroom. M.M. then described defendant sexually assaulting her by inserting his fingers into her vagina. M.M. recalled it hurt but she never said anything. M.M. could not recall what exactly she thought when it occurred. She was uncomfortable but thought it was okay at the time. She did not recall if defendant said anything to her while the assault took place, but she did

remember defendant told her that it was something she should not talk about and that it was normal.

¶ 31    M.M. testified about a second instance when defendant came into her bedroom and got into bed with her. M.M. said she did not have light in her room but slept with the door open so the light from the hall would come into the room. She knew it was defendant because she saw his face and his orange work shirt with jeans, which she associated with him working at the Pla-Mor. Once defendant was in bed with her, he sexually assaulted her by inserting his fingers into her vagina. M.M. testified she had some memories of ongoing instances of sexual assaults by defendant but she could not recall specific details of any other instance.

¶ 32    On cross-examination, M.M. testified that she was sure the assaults took place during the summer of 2003 when she was seven years old because they moved into their house in the fall of 2002. She said that she had health classes in junior high and her shame came from some of those classes, although her shame did not prompt her to tell anyone until the church program when she was a freshman in high school. She could not say which assault took place first. On the day of the bathroom incident, she said her younger brothers were in the house but she could not recall if her parents were home. M.M. believed she told Detective Kristopher Thompson in January 2011 about defendant locking the door but then corrected herself to say that she told Thompson about the incident in the bedroom. She then confirmed that she did not tell Thompson about the bathroom incident and only came forward later about that incident. M.M. confirmed that she told Thompson that defendant put her to bed two or three times and that she made no mention of defendant putting her to bed earlier in her testimony. She also stated that although she could see defendant's face due to the light from the hall, she could not remember if he closed the door when he entered her bedroom. She testified that her parents and brothers were home at the time and their rooms were both across the hall from her. Neither her parents nor brothers slept with their doors

open. M.M. could not recall if there were "conversations" with defendant during the sexual assaults. She recalled only defendant's repeated statements that "we don't talk about this." Defense counsel did not ask M.M. about her testimony in the prior two trials.

¶ 33                              2. *Defendant's Evidence*

¶ 34            Kristopher Thompson testified that he was a detective with the Decatur Police Department. In January 2011, Marianne told him the family moved into their home in August 2001 and defendant moved out of the house in 2006. Marianne did not tell Thompson that defendant left in 2004 and returned in 2006. Thompson also confirmed that when he spoke with M.M. in January 2011, she told him something happened two or three times in the bedroom when defendant was putting her to bed but she never said defendant was wearing an orange shirt or coming from work.

¶ 35            On cross-examination, Thompson testified his interview of M.M. was approximately 11 minutes. M.M. was soft-spoken and emotional as she spoke with Thompson.

¶ 36            Mark Morstatter testified that he had known defendant since 2008 when they became roommates. He knew of the allegations against defendant, and they remained roommates when defendant was not in prison. Sometime in 2009, Morstatter went with defendant to the family home. When they got to the house, M.M. opened the door and gave defendant a big hug. She then showed defendant pictures from her Facebook of her friends at school and the two talked about her school. Morstatter did not see M.M. show any hesitation, revulsion, anger, or fear towards defendant.

¶ 37            Defendant testified that he lived at the family home in the summer of 2002 but then lived at a variety of addresses over the next several years and only returned for a short time in 2003. He stated he never put his fingers inside M.M.'s vagina. He confirmed that he helped watch his younger siblings as a babysitter, he went swimming in the pool he helped set up, he worked at

the Pla-Mor at one point, and at times he was with one child while the others were in a different part of the house.

¶ 38    After closing arguments, the trial court stated that it "looked at the witnesses who have testified in this case" and found "it does come down to a credibility issue." The court found M.M. to be credible and found that the State had proven both charges of predatory criminal sexual assault of a child beyond a reasonable doubt. In April 2019, the trial court sentenced defendant to seven years in prison on each count to be served consecutively.

¶ 39    This appeal followed.

¶ 40                    II. ANALYSIS

¶ 41    Defendant appeals, arguing that (1) the State failed to prove him guilty beyond a reasonable doubt because "no evidence corroborated M.M.'s inconsistent and unlikely testimony" and (2) he received ineffective assistance of counsel because counsel did not impeach M.M. with her contradictory statements from the prior trials. We disagree and affirm the trial court.

¶ 42    A. The Evidence Was Sufficient to Support Defendant's Convictions for

Predatory Criminal Sexual Assault of a Child

¶ 43    Defendant contends that the State failed to present sufficient evidence to prove defendant guilty beyond a reasonable doubt because (1) no evidence corroborated M.M.'s testimony and (2) M.M.'s testimony was "inconsistent and unlikely." We disagree.

¶ 44                    1. *The Law*

¶ 45    The State bears the burden of proving each element of an offense beyond a reasonable doubt. *People v. Gray*, 2017 IL 120958, ¶ 35, 91 N.E.3d 876. When a defendant challenges his convictions arguing that the evidence was not sufficient to prove him guilty, a reviewing court must (1) consider the evidence in the light most favorable to the State and

- 9 -

(2) determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Brown*, 2013 IL 114196, ¶ 48, 1 N.E.3d 888.

¶ 46 " 'It remains the firm holding of this court that the testimony of a single witness, if positive and credible, is sufficient to convict, even though it is contradicted by the defendant.' " *People v. Sturgeon*, 2019 IL App (4th) 170035, ¶ 55, 126 N.E.3d 703 (quoting *People v. Siguenza-Brito*, 235 Ill. 2d 213, 228, 920 N.E.2d 233, 242 (2009)). "It is the responsibility of the trier of fact to resolve conflicts in the testimony, weigh the evidence, and draw reasonable inferences from the facts." *People v. Bradford*, 2016 IL 118674, ¶ 12, 50 N.E.3d 1112. "Accordingly, a reviewing court will not substitute its judgment for that of the fact finder on questions involving the weight of the evidence or the credibility of the witnesses." *People v. McGath*, 2017 IL App (4th) 150608, ¶ 26, 83 N.E.3d 671.

¶ 47 "A reviewing court will not reverse a defendant's conviction simply because there is contradictory evidence or because the defendant claims a witness was not credible." (Internal quotation marks omitted.) *Sturgeon*, 2019 IL App (4th) 170035, ¶ 56. "Instead, a reviewing court will reverse a defendant's conviction only when the evidence is so unreasonable, improbable, or unsatisfactory that it justifies a reasonable doubt of the defendant's guilt." *Id.*

¶ 48                                     2. *This Case*

¶ 49 Defendant argues M.M.'s inconsistent and unlikely claims, uncorroborated by any physical evidence and denied by defendant, are not believable. Defendant characterizes as suspect M.M.'s failure to mention during the 11-minute interview with Thompson that on one occasion defendant wore an orange shirt when he sexually assaulted M.M. in her bedroom. Defendant also finds incredible M.M.'s testimony that defendant sexually assaulted her when other family

members were present in the home.

¶ 50    Judging the credibility of a witness, particularly a witness attempting to remember incidents from her childhood, is no simple task. Although defendant argues that traumatic events would be in the forefront of M.M.'s mind, this court recognizes that different people remember events in different ways. One person may never forget a traumatic event and another may not recall a traumatic event until a triggering event causes that memory to spring to mind years later. The fact that M.M. recalled certain events or details later on that she did not recall earlier does not render her testimony suspect.

¶ 51    Defendant also argues that M.M.'s testimony is incredible because it suggests that defendant sexually assaulted M.M. while family members were present in the home, and therefore, it is likely defendant would have been seen. This argument is particularly unconvincing. People who commit egregious criminal acts often lack sound judgment. Defendant is correct that based upon M.M.'s testimony, he defied the odds by not getting caught in the act, but his risky conduct does not necessarily make M.M.'s account less credible.

¶ 52    Defendant's arguments squarely fall within the normal range of credibility determinations that lie within the fact finder's judgment. Because there is nothing about M.M.'s recollection of events that renders it inherently incredible, the evidence was sufficient to convict defendant of both counts of predatory criminal sexual assault of a child. We will not reverse a trial court's credibility determinations unless no rational trier of fact would have come to the same conclusion. That is not the case here.

¶ 53    B. Defendant Did Not Receive Ineffective Assistance of Counsel

¶ 54    Defendant contends that because counsel obtained the transcripts from the two prior trials but did not use them to impeach M.M.'s testimony at the January 2019 retrial, counsel was

ineffective. We disagree.

¶ 55                                    1. *The Law*

¶ 56        All defendants enjoy the constitutional right to effective assistance of counsel. U.S.
Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8. "To prevail on a claim
of ineffective assistance of counsel, a defendant must demonstrate that counsel's performance was
deficient and that the deficient performance prejudiced the defendant." *People v. Pope*, 2020 IL
App (4th) 180773, ¶ 61, 157 N.E.3d 1055.

¶ 57        To demonstrate deficient performance, a defendant must show his counsel's
performance fell below an objective standard of reasonableness. *Id.* ¶ 62. Because the constitution
guarantees only reasonably competent counsel, it is not sufficient for a defendant to show that
counsel's representation was imperfect. *Harrington v. Richter*, 562 U.S. 86, 110 (2011)
(citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). Instead, a defendant must show his
counsel's representation undermined the proper functioning of the adversarial process to such an
extent that the defendant was denied a fair trial. *Id.* (citing *Strickland*, 466 U.S. at 686).

¶ 58        To demonstrate prejudice, a defendant must show "that there is a 'reasonable
probability that, but for counsel's unprofessional errors, the result of the proceeding would have
been different.' " *People v. Moore*, 2020 IL 124538, ¶ 29 (quoting *People v. Domagala*, 2013 IL
113688, ¶ 36, 987 N.E.2d 767). " 'The likelihood of a different result must be substantial, not just
conceivable.' " *Pope*, 2020 IL App (4th) 180773, ¶ 63 (quoting *Harrington*, 562 U.S. at 112). " 'A
defendant must satisfy both prongs of the *Strickland* test and a failure to satisfy any one of the
prongs precludes a finding of ineffectiveness.' " *Id.* (quoting *People v. Simpson*, 2015 IL 116512,
¶ 35, 25 N.E.3d 601).

¶ 59        A defendant must overcome the strong presumption that the challenged action or

inaction may have been the product of sound trial strategy. *People v. Manning*, 241 Ill. 2d 319, 327, 948 N.E.2d 542, 547 (2011). The decision of whether and how to conduct a cross-examination is generally a matter of trial strategy. *People v. Jackson*, 2018 IL App (1st) 150487, ¶ 26, 105 N.E.3d 996. Strategic choices are virtually unchallengeable. *Manning*, 241 Ill. 2d at 333. "Defendant can only prevail on an ineffectiveness claim by showing that counsel's approach to cross-examination was objectively unreasonable." *People v. Pecoraro*, 175 Ill. 2d 294, 327, 677 N.E.2d 875, 891 (1997).

¶ 60                                     2. *This Case*

¶ 61          In the present case, defense counsel vigorously cross-examined M.M. Defense counsel questioned M.M. regarding what she learned in health classes concerning appropriate and inappropriate touching and why nothing in those classes prompted her to report defendant's sexual assaults earlier. Defense counsel questioned M.M. about the bathroom incident and her failure to tell Thompson in January 2011 about the incident. Defense counsel also questioned M.M. about her interview with Thompson in which M.M. stated that two or three separate assaults took place in her bedroom. Defense counsel cross-examined M.M. about details surrounding the bedroom incident, confirming (1) the hallway light was on, (2) her parents' room was right across the hall, and (3) she did not recall whether defendant closed her bedroom door.

¶ 62          Defense counsel then called Thompson to testify that M.M. did not tell him that an incident occurred in the bathroom; instead, M.M. reported to Thompson that the sexual assaults occurred in M.M.'s bedroom at a time when defendant was putting M.M. to bed. Thompson also testified that M.M. did not say defendant came home from work in an orange shirt or that the hallway light illuminated him. When the trial court rendered its verdict, the court noted that defense counsel revealed inconsistencies between when Thompson interviewed M.M. in January 2011 and

M.M.'s testimony at trial.

¶ 63    Defense counsel clearly recognized that it was important to discredit M.M.'s testimony and could have reasonably done so by (1) bringing out M.M.'s testimony at the prior trials, (2) bringing out what M.M. told Thompson, or (3) both. Defense counsel could have strategized that if he confronted M.M. with her inconsistent testimony from the prior trials, she could have explained the inconsistencies away. Conversely, Thompson would not be able to offer an explanation as to why M.M.'s memory changed. Defense counsel also may have been afraid of appearing as though he was berating or attacking M.M. with harsh questioning and reasoned that attacking her credibility by questioning Thompson, a police officer, would provide the same result with a lower risk of provoking a negative response from the trial court.

¶ 64    Because there are clear reasons why defense counsel may have made the choice to attack M.M.'s credibility in the manner counsel did, we conclude defense counsel's choice was a product of trial strategy. We will not reverse just because a different attorney may have employed a different strategy. We conclude that defendant received effective assistance of counsel.

¶ 65                                III. CONCLUSION

¶ 66    For the foregoing reasons, we affirm the trial court's judgment.

¶ 67    Affirmed.