2025 IL App (1st) 230959-U

SIXTH DIVISION

March 28, 2025

No. 1-23-0959

**NOTICE**: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court |
| | ) | of Cook County. |
| Plaintiff-Appellee, | ) | |
| | ) | |
| | ) | |
| v. | ) | No. 14 CR 3811 |
| | ) | |
| JAMES WILSON, | ) | Honorable |
| | ) | Ursula Walowski, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE C.A. WALKER delivered the judgment of the court.
Justices Hyman and Gamrath concurred in the judgment.

**ORDER**

¶ 1    *Held:*    We reverse the circuit court's denial of defendant's postconviction petition at the third stage and his conviction for first degree murder, and remand for a new trial, because trial counsel provided ineffective assistance of counsel.

¶ 2    Following a jury trial, defendant James Wilson was found guilty of first degree murder, with a finding that he discharged a firearm proximately causing the death of victim Barnett Adams, and was sentenced to a total of 50 years' imprisonment. He filed a petition pursuant to the Post-Conviction Hearing Act (Pub. Act. 102-639, § 10 (eff. Aug. 27, 2021) (amending 725 ILCS 5/122-1)) (the Act), which raised claims of actual innocence and ineffective assistance of counsel, the latter generally predicated on his trial counsel's decision to forgo arguing that Wilson acted in self-defense. The circuit court denied the petition after a third-stage evidentiary hearing. On appeal, Wilson claims the court erred because both of his claims were meritorious. We find Wilson's trial counsel provided ineffective assistance, and, accordingly, reverse and remand for a new trial.

¶ 3                                              BACKGROUND

¶ 4    Wilson was arrested on January 27, 2014, and charged with six counts, including count V for first degree murder (720 ILCS 5/9-1(a)(1) (West 2012)), including that in committing the offense he personally discharged a firearm that proximately caused death. The charges arose from the shooting death of Adams on December 19, 2013. Wilson's trial counsel entered his appearance on August 26, 2014.

¶ 5    In Wilson's first answer to discovery, he indicated he intended to pursue self-defense as an affirmative defense. Wilson also moved for discovery regarding Adams' character for aggression or violence, including information related to three cases of domestic battery against Adams, pursuant to *People v. Lynch*, 104 Ill. 2d 194 (1984).

¶ 6    On November 3, 2015, Wilson's trial counsel presented a motion to withdraw self-defense as an affirmative defense. The motion stated that Wilson was "aware that should slight evidence of justification for the force used be introduced, and the fact finder believe that the Defendant had a belief that the force used was necessary, but that belief was unreasonable, he would be entitled

to a 2nd degree murder instruction *** which carries a 20-year minimum sentence at 50%." The motion continued that Wilson instructed counsel to "withdraw" self-defense. Finally, the motion withdrew the discovery request for *Lynch* material. During a hearing on the motion, trial counsel stated, "I'm going to ask the defendant to sign this in open court if I may, you Honor." The circuit court admonished Wilson, "[Trial counsel] is now asking leave to withdraw that previously filed defense *** and instead put the State on notice that the sole defense [he] will present on your behalf will relate to the State's inability to prove you guilty beyond a reasonable doubt. Do you understand that?" Wilson responded affirmatively. The court continued, "you will not be able at trial to present any defense such as self-defense or defense of another person. Do you understand that?" Wilson again responded affirmatively. The court granted the motion and indicated on the record that Wilson signed the waiver.

¶ 7    Trial started on May 22, 2017, with the State proceeding on counts V and VI only. Moayad Nassan testified that on December 19, 2013, he was working as the manager at the West Side Food Mart ("the store") located on the 5600 block of West Chicago Avenue in Chicago. He worked with another individual that day, whose name he could not recall. Adams, who Nassan knew as a regular customer, entered the store with "another guy" at approximately 5 p.m. While Adams was inside, Wilson entered the store. Wilson was not a regular, but Nassan had seen him "a few times around" before December 19. Nassan identified Wilson in court.

¶ 8    Adams and Wilson had an "angry conversation," with Wilson saying to Adams, "you don't know who you're messing with." During the conversation, the men were five to six feet away from Nassan, who could see Wilson's face. After two to three minutes, the men exited the store, and Nassan followed them and stood by the front door. There were "a lot of people outside," and Adams and Wilson were fighting. During the fight, Wilson faced the store, with Adams' back to

the store. Both men threw punches at the same time, but Adams' punch connected. Nassan could not determine who swung first. Wilson fell, then removed a firearm from his waist, pointed it at Adams, and fired. Nassan did not see Adams or anyone else on scene with a firearm. After the first shot, Nassan ducked, and heard four or five more shots. Nassan then saw Wilson enter his vehicle on the driver's side and drive east on Chicago Avenue. He could not remember the vehicle's color. Later that night, Nassan met with Chicago police detectives, who showed him a photo array. Nassan did not identify the shooter in the array and testified this was because "[the array] was black and white" and he "couldn't exactly tell." On January 28, 2014, Nassan identified Wilson in a lineup at the police station.

¶ 9    On cross-examination, Nassan testified that his interaction with the officers on December 19, including his failure to identify Wilson in the photo array, happened less than an hour after the incident. He did not recall telling a detective that he had never seen the shooter before. On December 19, he described the shooter as six feet one inch tall, but agreed Wilson appeared to be approximately five feet nine inches tall. Wilson wore a hat during the incident. Nassan did not recall telling officers that Wilson's vehicle was red or burgundy. He acknowledged he did not appear at a prior court date, but did not know a contempt proceeding was dismissed against him shortly before his testimony that day.

¶ 10   Charles Davis testified that he had a prior conviction for attempt murder. He also had a pending case for narcotics, for which he received no promises regarding his testimony from the State. On December 19, 2013, he was at the store with Adams and Kacy Reed. At some point Wilson, who Davis identified in court, arrived at the store. Davis had known Wilson for six or seven years at the time. Wilson asked the group if they knew where an individual named Jay was,

4

and Adams said he did not. Wilson and Adams exchanged words for a short time, then "one or the other invited the other one outside."

¶ 11 Wilson and Adams exited, followed by a group of people including Davis. The two exchanged punches, causing Wilson to fall back against his vehicle. They hit each other at roughly the same time. Adams stepped back towards the store. As Wilson rose from the ground, he "came back up shooting" towards Adams, who was unarmed. Davis saw Wilson fire three shots, and believed he heard a fourth. At no time during the shooting did Adams move towards Wilson. The "fight" only consisted of the single exchange of punches.

¶ 12 Davis left the area briefly but returned and called 911. An ambulance and Chicago police officers arrived, and the officers instructed people to leave the scene, so Davis complied. Two days later Davis met with Chicago police detectives at the Area North station and identified Wilson in a photo array.

¶ 13 On cross-examination, Davis admitted he believed the State would "consider" rewarding him for his testimony. He did not stay on the scene following the incident to tell the officers Wilson was the shooter. While at Area North, Davis told the detectives Wilson left in a light-colored vehicle, and they never asked him about a red or burgundy vehicle. Davis did not recall Wilson wearing a hat the day of the incident. The firearm Wilson used was a revolver.

¶ 14 The parties stipulated that Michael Allen, a paramedic, would testify Adams died in the emergency room of Mt. Sinai Hospital. They further stipulated that a Chicago police evidence technician would testify that three bullets were recovered from the scene, and a Chicago police forensic scientist would testify the bullets were .44 caliber.

¶ 15 Timothy Moore testified that he had previously spent time in prison due to convictions for burglary and narcotics. On December 19, 2013, he was walking towards the store to buy a light

bulb and noticed Adams and Wilson, both of whom he had known for approximately 20 years, arguing outside the store. Moore saw Adams hit Wilson first and Wilson fall as a result, and stated "next thing, I saw some fire coming. So I ducked into the store." The "gunfire" came from the ground near where Wilson fell. He heard about four to five shots. Moore left the scene because he did not want to be shot himself. The following day, Moore was arrested on a drug charge. The officers asked him if he knew "what happened the other day," and Moore responded "yeah, I heard some shots." Moore then spoke to a detective and identified Wilson in a photo array. Moore was not charged following that arrest. On cross-examination, Moore stated he was in a "jam" when he picked up the drug case.

¶ 16    Steven Jackson testified that he had multiple felony convictions. On December 19, 2013, he was working at the store as a stock person and saw Wilson and Adams arguing inside the store. Jackson identified Wilson in court. Jackson stayed behind the counter when the two exited. Through the window, he saw Adams hit Wilson and Wilson fall. Jackson could not see Wilson while he was on the ground. Adams "was standing over" Wilson. Jackson then heard four to five gunshots. He dropped to the ground, and when he stood up, Wilson was gone. Jackson spoke to police officers that night. On January 27, 2014, he identified Wilson in a line-up at the police station. On cross-examination, Jackson testified that he had never seen Wilson before the incident.

¶ 17    Reed testified that Adams was his best friend. On December 19, 2013, at approximately 5 p.m., he was outside the store, with Adams inside, when Wilson, whom Reed had known for years, arrived with a "few guys" in a vehicle Wilson was driving. Wilson asked Reed where someone was, and Reed responded he did not know. Wilson then entered the store and spoke to Adams. Moments later, Wilson exited the store and said, "y'all need to think I'm a bitch." Adams followed. Wilson balled up his fists and "walked in front of" Adams. Both men threw punches, but Adams

landed his, and Wilson fell close to his vehicle. Adams stood "still" beside Reed. Wilson then "pulled a gun out of his back and started shooting at" Adams and Reed. The firearm was "probably" a "Colt .44" revolver. Wilson fired four to six times. Reed ran towards the alley but returned moments later and saw Davis holding Adams.

¶ 18  On January 25, 2014, Reed identified Wilson in a photo array. Reed also identified two other men that were with Wilson that night in separate photo arrays. He did not speak to police officers sooner because he was mourning Adams, and Reed agreed that he was angry and intended on handling Adams' shooting himself.

¶ 19  On cross-examination, Reed agreed he did not speak to police officers on December 19, 2013. When he did speak to officers, he told them Wilson was driving a blue Infinity and not wearing a hat on the day in question.

¶ 20  Dr. Lauren Woertz, an assistant Cook County medical examiner, testified that she examined Adams on December 20, 2013, and concluded his cause of death was multiple gunshot wounds, and the manner of death was homicide.

¶ 21  Chicago police detective Michael Kennedy testified that on December 19, 2013, he was assigned to Adams' shooting. He and his partner Detective Nanninga went to the scene and interviewed Nassan and Jackson. The detectives already suspected Wilson, and showed Nassan the photo array with that in mind, but Nassan did not make an identification. Later that evening, Kennedy "asked the narcotics division to help us with a buy bust in that area." A "buy bust" is an investigative tool where police officers conduct undercover narcotics purchases, arrest the sellers, then "asked them do you know anything about the shooting that may have occurred yesterday."

¶ 22  The next day, he learned that Moore, who was arrested in the "buy bust," was a potential witness. Kennedy and Nanninga interviewed Moore in the Homan Square facility. During the

7

interview, Moore identified Wilson in a photo array. Moore was later released without being charged. Kennedy also spoke to Davis on December 20, who was also shown a photo array.

¶ 23  On January 25, 2014, Kennedy interviewed Reed, who identified Wilson in a photo array. Reed also identified three other individuals as potential witnesses. Two days later, Kennedy learned that Wilson was in custody. He then conducted a physical line-up, during which Jackson and Nassan identified Wilson.

¶ 24  On cross-examination, Kennedy testified that neither Davis, Reed, nor Moore were present on the scene when Kennedy first arrived. During his on-scene interview, Nassan told Kennedy he had never seen the shooter before and the shooter entered a red or burgundy sedan.

¶ 25  The State rested, and the circuit court denied Wilson's motion for a directed verdict. Wilson did not testify, present evidence, or tender a jury instruction on second degree murder.

¶ 26  During jury deliberations, the circuit court asked defense counsel, "you asked for no other instructions, I just want to verify you've contemplated lesser included or second degree or involuntarily, you've chosen not to present those, correct?" Defense counsel responded, "After speaking with my client vociferously, your Honor, we are not."

¶ 27  The jury found Wilson guilty of first degree murder, during which Wilson personally discharged a firearm that proximately caused Adams' death.

¶ 28  Wilson's trial counsel filed a "motion to withdraw as counsel" on July 18, 2017, citing "irreconcilable differences." Through his new counsel, Wilson filed a motion for a new trial, arguing newly discovered evidence, specifically a witness named Dennis Shields. At a hearing on the motion, Shields testified he attended school with Wilson. He lived near the store, and on December 19, 2013, he was walking past it in the evening when he heard gunshots. He saw a large crowd of people coming towards him, and he "thought somebody must had got shot." Shields

walked towards a cleaner in the area, and saw "a man laying there on the ground." He also saw another man "headed for the alley, looked like he had a gun in his hand. He turned down the alley." This man was not Wilson; he was between 19 and 26 years of age, with either a "do-rag or dreads." Shields also saw a vehicle containing three men leave the area, and Wilson was not one of them.

¶ 29   Shields went back home instead of to the cleaners. Later that night, he posted on Facebook, "Having a hard time trying to understand what just happened. Walking to the cleaners ten minutes ago and a man standing next to me gets shot down, five shots, by a teenager. Holding back tears as I looked into the man's eyes that dripped his last tear as I called for an ambulance."

¶ 30   On cross-examination, Shields acknowledged that his statement "the man standing next to me when he gets shot" was inaccurate. After posting on the night of the incident, he "forgot to call the police." On questioning from the court, Shields testified he was not sure he saw the shooter.

¶ 31   The circuit court denied the motion for a new trial, stating the issue was whether Shields' testimony was of "such character that it would likely change the outcome of the trial" and found it was "insignificant to a degree that it would not add anything."

¶ 32   The matter moved to sentencing where, after a hearing, the circuit court merged count VI into count V and sentenced Wilson to 25 years' imprisonment for first degree murder with the 25 year firearm enhancement (see 730 ILCS 5/5-8-1(a)(1)(d)(iii) (West 2012)), for a total of 50 years' imprisonment.

¶ 33   On direct appeal, Wilson argued the circuit court abused its discretion by not ordering a new trial based on Shields' testimony. This court affirmed. *People v. Wilson*, 2020 IL App (1st) 181465-U.

¶ 34   Wilson filed a postconviction petition on October 27, 2021, alleging ineffective assistance of counsel and actual innocence. Regarding ineffective assistance, he argued "Trial counsel's

failure to properly admonish Wilson about the minimum and maximum sentence he faced for his potential affirmative defenses caused Wilson to reject the defenses in his trial." He further stated in the petition "[C]ounsel's improper admonishment and his failure to submit instructions on self-defense and second-degree murder deprived [Wilson] of effective assistance of counsel."

¶ 35    The petition advanced to the third stage, and an evidentiary hearing was held on April 18, 2023. In his opening statement, Wilson's counsel stated that one of Wilson's claims "is that he received ineffective assistance of counsel when he withdrew two affirmative defenses. The first being self-defense and the second being a lesser included second degree murder."

¶ 36    Davis testified that he did not actually recognize the man with whom Adams was arguing and ultimately punched, and he was only "told later on who that person was." After the shooting, Davis called 911 "immediately," but did not speak with responding officers that night. Days later, Davis went to the police station with detectives, who told him they knew he was there because Moore told them while making a deal with the officers. The officers told Davis what happened with Adams' shooting. They showed him a picture of Wilson, and Davis responded, "yeah, that's the guy" because Wilson resembled the shooter, though Davis was uncertain. After returning home from speaking with the detectives, Davis asked Moore why he involved Davis in the case. Moore responded that the officers told him "they would drop the drug thing that they had just arrested him for if he gave them information pertaining to the case."

¶ 37    At trial, Davis testified that Wilson was the shooter despite his uncertainty because "before trial they kept putting us in the room with [Adams'] family, and his mother and everybody. We all talking. And I am listening to what everybody else is saying, what [Reed] is saying, what [Jackson] is saying." This happened on multiple occasions before Davis actually testified, and he was "influenced by everything that everybody was saying in the room because I still wasn't sure."

Davis further explained that at the time of trial, he was a heroin addict, but after he "got clean" following the trial he reached out to Wilson's family to express his uncertainty. Additionally, while incarcerated, Davis saw an individual named Tyson Brown, and thought to himself, "that's the guy that did not the shooting" and "I could have made a big mistake." Davis responded to the question, "As you sit here today, do you know who the shooter [was]" with "No, I don't."

¶ 38    On cross-examination, Davis acknowledged he testified before both the grand jury and at trial that Wilson was the shooter. He said he was "stoned" when the detectives were questioning him at the police station. Moore was also a heroin addict at the time.

¶ 39    Wilson testified that his trial counsel discussed self-defense and second degree murder with him before trial. Counsel said if he testified, he could get "45 years to natural life." Wilson told counsel he did not want to pursue the theories because it would amount to Wilson "saying I done something that I didn't do." At the time, he understood the minimum for second degree murder to be 20 years' imprisonment, and counsel never informed him the minimum was actually four years' imprisonment, or that it was a probationable offense. Had he known of the actual second degree murder sentencing range, he would have wanted the instruction, and would have been willing to testify. Counsel did not inform Wilson that he could request a second degree murder jury instruction without testifying.

¶ 40    On cross-examination, Wilson explained that in a scenario where he testified at trial, he would have told "the Court that the conversation me and my attorney had, that the 45 years to life. That's something that I didn't do." He continued, "I wouldn't have told the Court I did nothing." On redirect, Wilson confirmed that he relied on the representation in trial counsel's written motion to withdraw self-defense in determining whether to pursue self-defense, including the passage that misstated the minimum sentence for second degree murder as 20 years' imprisonment.

¶ 41   The State called Wilson's trial counsel, who testified that he and Wilson had a "very, very unique relationship." Wilson was probably the client he was "closest" to because he tried multiple cases for him and knew his family, including his mother and brother. Counsel had previously represented Wilson at trial for a "double attempt murder," in which he was found not guilty. During that trial, counsel suggested Wilson accept a plea offer, but Wilson hugged counsel and said, "You're the only father I know. *** I won't take it. I believe in you, even if you don't believe."

¶ 42   Respecting the current case, Wilson's trial counsel initially believed "it was immediate that this was a clear self-defense case from the State's version of events." He referenced his understanding that a potential State's witness had said pretrial that after Adams hit Wilson, Adams "mumbled something or was like I will kill you or something like that, threatening words, and then that [Wilson] had fired." Before trial, however, Wilson decided not to pursue self-defense, with counsel clarifying, "I did not make that determination. [Wilson] made that determination." Wilson insisted "he was never going to take a self-defense stance," and that counsel was to withdraw self-defense. Counsel told Wilson if he did that, he could not argue self-defense later, and Wilson said he understood. This stance particularly concerned counsel because he believed Adams had a criminal background such that counsel could show he was the aggressor.

¶ 43   Trial counsel informed Wilson of the sentencing range for second degree murder a "number of times," including that "it carries probation, but [up] to a 20 year maximum." Counsel acknowledged it was "very unusual" to file a motion to withdraw an affirmative defense, but he did so in this case because he "didn't want it to be argued later, of course here we are, in a postconviction or something I had never informed him of self-defense and that I had the ability, if there was no evidence, that I had actually done it. And I thought it was the best defense." The motion also showed "it was not my decision to do this, that it was [Wilson's] decision to withdraw

self-defense." Counsel acknowledged the form stated the minimum for second degree murder was 20 years' imprisonment. He said it was a "mistake" and a "typo" which he made because "I was so concerned with making sure it was evident that it wasn't the lawyers telling him to do this, it was him, that I made the mistake."

¶ 44 Trial counsel did not ask for the second degree murder jury instruction at trial because Wilson "said he did not want to do it" and "gave us the order not to do it." Counsel "thought there was an excellent chance that the jury would come back with murder in the second degree" if they had asked for the instruction. He and his co-counsel "talked about that often, that this very well could be a second degree had we asked for self-defense and the second degree instruction. So I thought this was a very big possibility, from the State's case, of getting that."

¶ 45 On cross-examination, counsel agreed self-defense was the "best defense" for Wilson in the case. He thought this was a self-defense case even without Wilson's testimony. On redirect, counsel testified that he would have had no problem arguing both self-defense and misidentification, if Wilson "had let" him.

¶ 46 Ernest Magana, an investigator for the State's Attorney's office, testified that he interviewed a man named Calvin Buchanan in connection with this case. Buchanan stated during the interview, "he didn't do it, and that's the – it must have been a witness who was put on the stand that in [Buchanan's] opinion was a drug addict." Buchanan never specified to whom he was referring, but Magana's understanding was that he was talking about Wilson and Adams. On cross- examination, Magana relayed that he did not specifically mention Wilson's name to Buchanon, but did explain he was asking about the incident on Chicago Avenue.

¶ 47 James Stewart, another investigator, testified that he interviewed Brown in relation to this case. Brown said he did not know anything about the incident. He was unfamiliar with Adams,

13

Wilson, Moore, or Buchanan, but was familiar with Davis, who he met on a bus from jail to the courthouse. Stewart determined that Brown was "in custody" on December 19, 2013. On cross-examination, Stewart stated he never interviewed Davis.

¶ 48   Following argument, the circuit court ruled in favor of the State on May 17, 2023. The court found that it was Wilson's decision to not pursue theories of self-defense or second degree murder. It accepted counsel's representation that the 20-year minimum sentence statement in the motion to withdraw self-defense was a typo, and found it credible that Wilson spoke to his counsel and knew the proper sentencing range. The court also found incredible Wilson's testimony that he relied on the representation of the minimum sentence in the motion, and the contention that "things might have changed if he knew the actual sentencing range for second-degree"; instead, the court found "Wilson knew exactly what the sentence range for second-degree was." This appeal followed.

¶ 49                                    JURISDICTION

¶ 50   The circuit court denied the petition on May 18, 2023, and Wilson filed his notice of appeal that same day, giving this court jurisdiction pursuant to article VI, section 6, of the Illinois Constitution (Ill. Const. 1970, art VI, § 6), and Illinois Supreme Court Rule 651 (eff. July 1, 2017).

¶ 51                                    ANALYSIS

¶ 52 Wilson argues on appeal that the circuit court erred by denying both his ineffective assistance of counsel and actual innocence claims following the third-stage evidentiary hearing.

¶ 53   The Act provides a mechanism for criminal defendants to challenge a conviction on the grounds that it violates his rights under the Federal or Illinois constitutions, or both. *People v. Dupree*, 2018 IL 122307, ¶ 28. Petitions under the Act proceed in the three stages. *Id.* When a petition is advanced to the third stage, the circuit court may conduct a hearing, and can "receive proof by affidavits, depositions, oral testimony, or other evidence." 725 ILCS 5/122-6 (West

14

2020). At a third-stage evidentiary hearing, the defendant must show by a preponderance of the evidence that his constitutional rights were violated. *People v. Coleman*, 2013 IL 113307, ¶ 92. "After an evidentiary hearing where fact-finding and credibility determinations are involved, the circuit court's decision will not be reversed unless it is manifestly erroneous." *People v. English*, 2013 IL 112890, ¶ 23. Ineffective assistance of counsel claims at this stage, however, often involve mixed questions of law and fact, in which the reviewing court will review the circuit court's factual findings and credibility determinations under the manifest weight of the evidence standard, but reviews *de novo* the "ultimate determination of whether counsel rendered ineffective assistance." *People v. Velasco*, 2018 IL App (1st) 161683, ¶ 137.

¶ 54   We begin with Wilson's ineffective assistance of counsel claim. To establish ineffective assistance of counsel, a claimant must demonstrate both that their counsel's conduct was objectively unreasonable, and that, but for counsel's deficient conduct, there was a reasonable probability of a different result. *People v. Patterson*, 2014 IL 115102, ¶ 81.Trial strategy decisions are accorded a substantial amount of deference, but criminal defense counsel may act objectively unreasonably by failing to investigate a viable defense (see *People v. McGhee*, 2012 IL App (1st) 093404, ¶ 36) or by deciding not to present a viable defense based on a misunderstanding of the law. See *People v. Wright*, 111 Ill. 2d 18, 26-31 (1986); see also *People v. Gallagher*, 2012 IL App (1st) 101772, ¶ 29 (counsel acted objectively unreasonably by not requesting a lesser included offense jury instruction that "counsel clearly contemplated.")

¶ 55   Wilson claims that his trial counsel was ineffective in his handling of the self-defense and second degree murder issues, focusing on the motion to withdraw self-defense counsel had Wilson sign in open court which stated second degree murder carried a 20-year minimum sentence. At the third-stage evidentiary hearing, counsel acknowledged the error, calling it a "typo." Counsel

maintained, however, that Wilson knew the proper sentencing range for second degree murder, including the minimum sentence and that it was probationable, but Wilson still insisted that counsel not pursue any theory based on self-defense.

¶ 56   At the third-stage evidentiary hearing, trial counsel also emphasized that, in his opinion, self-defense was the best argument Wilson had in the case, and his trial strategy would have been to pursue self-defense and second degree murder theories, including jury instructions, but for Wilson's unwillingness to do so. Counsel was emphatic that self-defense was Wilson's "best defense." He believed that, had he asked for a second degree murder instruction, there was a strong possibility the jury would have returned that verdict. Counsel further made clear that he would have had no problem pursuing misidentification and self-defense theories concurrently, and it was not a strategic decision on his part to forgo arguing both to avoid jury confusion.

¶ 57   On this record, we find Wilson's trial counsel provided ineffective assistance, reverse the circuit court's denial of Wilson's postconviction petition and his conviction, and remand for a new trial. On the first prong, counsel's conduct was objectively unreasonable because he decided to abandon his client's best defense based solely on a fundamental misunderstanding of the law, and "if counsel makes tactical decisions based on a misapprehension of the law, those decisions may cause counsel to be deemed ineffective." See *People v. Anthony Roy W.*, 324 Ill. App. 3d 181, 186-87 (2001) (citing *Wright*, 111 Ill. 2d 18); see also *People v. Jackson*, 2018 IL App (1st) 150487, ¶ 29 (decision to pursue "all or nothing" defense strategy may be unreasonable if based on a misapprehension of the law or if it was the functional equivalent of withdrawing a lesser-included offense instruction). Counsel testified he would never have entered the waiver, chose not to pursue self-defense and second degree murder theories at trial, or failed to ask for the corresponding jury instructions, but for Wilson's decision not to permit the arguments.

¶ 58    The problem is these decisions were counsel's to make, not Wilson's. The law is clear that the decisions of whether to request a second degree murder jury instruction and what affirmative defense to pursue at trial are matters of trial strategy that belong to counsel alone. See *People v. Wilmington*, 2013 IL 112938, ¶¶ 44-48; *People v. Edmondson*, 2018 IL App (1st) 151381, ¶ 40. Counsel chose not to pursue self-defense and second degree murder based only on his mistaken belief that Wilson could bar him from doing so, and not on any strategic decision to which this court could accord the typical deference, a point counsel made explicit at the third-stage hearing. See *Jackson*, 2018 IL App (1st) 150487, ¶ 29. While matters of trial strategy are generally not grounds for an unreasonableness finding in ineffective assistance claims, counsel's conduct here in abandoning his strongest argument based on a fundamental misunderstanding of law qualifies this case as an exception. See *Wright*, 111 Ill. 2d at 26-31.

¶ 59    The State argues this court should not consider this argument because Wilson forfeited it, maintaining (1) ineffective assistance could have been raised on direct appeal, and (2) Wilson's only theory for ineffective assistance during the postconviction proceedings was based on the motion to withdraw self-defense, and he only raised counsel's misunderstanding of the law for the first time on appeal. First, the record shows this issue could not have been raised earlier. The testimony at the third-stage evidentiary hearing from Wilson and his trial counsel about their interactions makes up the core of the claim, and this information was not in the record on direct appeal. See *People v. Veach*, 2017 IL 120649, ¶ 46. Second, we find that Wilson sufficiently challenged his counsel's conduct regarding the self-defense and second degree murder theories in general to fully pursue the issue on appeal. His postconviction petition stated "counsel's improper admonishment and his failure to submit instructions on self-defense and second-degree murder deprived him of effective assistance of counsel." Moreover, in his opening statement, Wilson's

17

postconviction counsel stated that the ineffective assistance claim was based on challenges to trial counsel's decision to "withdraw" two affirmative defenses. Finally, we note that even if we agreed with the State that Wilson forfeited this specific theory of ineffective assistance, forfeiture is a limitation on the parties, not this court. See *People v. Castellano*, 2020 IL App (1st) 170543, ¶ 48.

¶ 60   Next, the State argues that we should affirm because appellate courts defer to a circuit court's credibility finding at third-stage hearings, and here the circuit court found Wilson incredible on whether he relied on the inaccurate language in the motion to withdraw self-defense, and trial counsel credible that he informed Wilson of the proper sentencing range for second degree murder. While we have concerns about this finding (given the clarity with which counsel's motion to withdraw self-defense states the wrong sentencing range, and the fact that Wilson signed this specific writing in open court), ultimately the court's credibility determination on this issue is tangential to our resolution. Even accepting the court's credibility determinations, there is no dispute counsel's trial strategy was based entirely on the misunderstanding of the law explained above, and we review the ultimate question of whether counsel's conduct was unreasonable under a *de novo* standard in situations when the relevant fact findings and credibility determinations are undisputed. See *Velasco*, 2018 IL App (1st) 161683, ¶ 137.

¶ 61   Finally, the State argues Wilson cannot pursue this claim because it constitutes invited error. This argument fails because the invited error doctrine relates to challenges of the actions the court undertakes at the invitation of a subsequently complaining party, and does not act as a bar to ineffective assistance of counsel claims. See *People v. Villarreal*, 198 Ill. 2d 209, 227-28 (2001); see also *People v. Wood*, 2014 IL App (1st) 121408, ¶¶ 57-59.

¶ 62   Moving to the second prong of ineffective assistance, we find Wilson was prejudiced by this conduct because there is a reasonable probability that if counsel had not waived self-defense

18

before trial, and instead pursued self-defense and second degree murder to the full extent of his duties as Wilson's counsel, there is a reasonable probability the trial result would have been different. Counsel's decision undermined the entirety of the trial process, depriving Wilson of what counsel acknowledged was his best defense from the beginning. See *People v. Shepherd*, 2020 IL App (1st) 172706, ¶¶ 22-23, 33; see also *Gallagher*, 2012 IL App (1st) 101772, ¶ 29. If counsel had not entered the waiver, the State would still have been on notice of the intent to pursue the affirmative defense, meaning counsel could have discussed self-defense in his opening statement, asked questions about it on cross-examination, and tendered the appropriate jury instructions.

¶ 63    Multiple aspects of the trial record support this finding. The circuit court demonstrated it was likely to give the second degree instruction despite Wilson not testifying. The jury never heard the *Lynch* material. And the State's trial witnesses established that during the fight, a crowd had gathered outside, and Adams hit Wilson hard enough to send him to the ground, with conflicting accounts of whether Adams was standing over Wilson or backing away when Wilson fired the shots. Accounting for these factors as a whole, our confidence the jury would have reached the same verdict had counsel pursued self-defense is undermined, establishing prejudice. *Patterson*, 2014 IL 115102, ¶ 81.

¶ 64    The State argues Wilson cannot demonstrate prejudice because his unwillingness to pursue self-defense demonstrates he would not testify to support the theory at trial. This argument fails because a defendant can argue self-defense based on the State's evidence alone if the evidence sufficiently raises the issue. See *People v. Everette*, 141 Ill. 2d 147, 156-57 (1990). Moreover, Wilson's trial counsel testified that arguing self-defense without Wilson's testimony would have been his strategy but for his erroneous belief that Wilson's preference prevented him from doing

so. As discussed above, the trial record, as it was, arguably raised the self-defense issue, and this was without counsel strategically developing the record.

¶ 65 Similarly, the State's argument that Wilson cannot show prejudice because the trial evidence would not support self-defense or second degree murder jury instructions fails, as the argument ignores that the evidence was developed subject to trial counsel's abandonment. The record suggests that even without Wilson's testimony, a self-defense affirmative defense could be developed at trial through cross-examination (including asking the witnesses whether Adams threatened to kill Wilson after the first punch) and the *Lynch* material, which would make the instructions appropriate.

¶ 66 Finally, because we reverse and remand for a new trial on Wilson's ineffective assistance claim only, we do not reach his actual innocence claim and make no comment on the merits thereof. We also note that retrial on remand is appropriate because, upon careful review of the record, we find the evidence at trial was sufficient to sustain the verdict if viewed in the light most favorable to the State, meaning there are no double jeopardy issues with retrial. See *People v. Miramontes*, 2018 IL App (1st) 160410, ¶ 22.

¶ 67                                                    CONCLUSION

¶ 68 For the foregoing reasons, we reverse the circuit court's denial of Wilson's postconviction petition and his conviction itself, and remand for a new trial.

¶ 69 Reversed and Remanded.